[No. D014543. Fourth Dist., Div. One. Sept. 8, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIE RANKIN, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

---

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts IC, ID, and II.

## COUNSEL

Lynda A. Romero, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Robert M. Foster and Frederick R. Millar, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WIENER, Acting P. J.**—In an earlier trial, defendant Willie Rankin was acquitted of robbery but convicted of being an accessory after the fact (Pen. Code, § 32[2]) and acquiring a credit card with intent to use it fraudulently (§§ 484e, subd. (3) and 487, subd. 1). This court then reversed in an unpublished opinion based on evidentiary and instructional errors. (*People v. Rankin* (Oct. 24, 1990) D010454.) In a second trial, Rankin was again convicted of identical charges. He appeals, now alleging different types of instructional and evidentiary error. On this occasion we are unpersuaded and affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Having been previously acquitted of robbing Marjorie Reid, Rankin was retried on charges of assisting the perpetrator after the robbery and of fraudulently using one of Reid's credit cards.

*The Robbery of Marjorie Reid*

On October 16, 1988, Marjorie Reid and her husband, Fred, were in San Diego to attend a meeting. That evening after dinner, Marjorie was assaulted in the parking lot of their Mission Valley hotel and her purse stolen. No one witnessed the assault, although Fred arrived shortly afterward to assist his wife. As a result of injuries suffered during the incident, Marjorie has no memory of what happened to her and did not testify at trial. Some of the contents of her purse were discovered in a trash can near the Mission Beach roller coaster early the next morning and turned over to police.

---

[2]All statutory references are to the Penal Code unless otherwise indicated.

*Events Before and After the Robbery*

The facts developed at trial indicated that Reid's purse was stolen by William Austin, also known as "Chill." Rankin and Dwayne Elliott were implicated as accessories after the fact.[3] Rankin and Elliott were in the Navy together assigned to the same ship. Austin was a mutual friend Rankin had met while playing basketball.

On the evening of October 16, Rankin, Elliott and Austin left a friend's house in El Cajon and drove toward the beach. When they stopped at a Mission Valley gas station, Austin left the car and returned a few minutes later, as Rankin and Elliott were preparing to leave. Rankin was driving; Elliott sat in the front passenger seat with Austin in the backseat. As they continued their drive to the beach, Rankin and Elliott became aware that Austin had stolen the purse. According to Elliott, Austin told them he "snatched it." Rankin stated that at some point during the drive he noticed Austin and Elliott sifting through the contents of a woman's purse, which he suspected was stolen.

After they arrived at a parking lot near the beach, the trio divided the money from purse, with Rankin receiving "five or six dollars." Elliott testified that the "miscellaneous" items in the purse—other than cash, credit cards and some jewelry—were thrown in a nearby trash can. In an earlier statement he had specified that Rankin was the one who threw away the purse contents. According to Rankin, he told Austin and Elliott, "All I want you to do is get the stuff out of my car. I don't want to have nothing to do with it." When he returned after taking a short walk, the purse and its contents were gone.

*Rankin's Use of the Credit Card*

Three days later, Rankin presented one of Marjorie Reid's credit cards at the Gym Bag store in the University Towne Center shopping mall. According to Rankin, he had retrieved the card from Elliott at Austin's instruction after they learned that Elliott was using it to charge merchandise by phone. He went with Austin to the Gym Bag intending merely to leave the card and

---

[3]As part of a plea bargain Elliott pleaded guilty to being an accessory after the fact and testified against Rankin. In addition to Elliott's testimony, the prosecution presented its case to the jury largely through statements made by Rankin to police at various points in time. Rankin also testified at trial in a manner consistent with some of his pretrial statements. Because several of the issues in the case concern the sufficiency of the evidence to support certain instructions favorable to the defense, we state the facts in a manner which includes Rankin's trial testimony, noting the points where there are significant discrepancies between Rankin's version of the events and that proffered by the prosecution.

walk out. While they were talking with one of the store clerks, Austin asked out loud whether he could use Rankin's mother's credit card to buy a jacket. Rankin claimed he responded, "No . . . because she will be mad if you try to use her credit card. It's already been charged anyway." He admitted, however, that after he placed the credit card on the counter, Austin put a hat and shirt on the counter and the clerks treated it as though Rankin were attempting to make a credit card purchase. At that point, according to Rankin, he followed Austin and left the store.

The testimony of store personnel differed somewhat. They stated that after Rankin and another man (presumably Austin) entered the store, the other man selected a shirt and hat and placed them on the counter. Remarking that it was his mother's credit card and she might be upset if he charged too much on it, Rankin gave the card to one of the clerks. The request for a credit authorization took an unusually long period of time, apparently because the card was stolen. At some point while the clerk was still on the phone, Rankin left the store, joined his companion (who was already outside) and walked away.

*The Initial "Cover Up" and Rankin's Defense*

Police suspicion first focused on Dwayne Elliott, who led them to Rankin. When Rankin was questioned by Detective Janet Wright on October 26, he talked about the incident at the Gym Bag but insisted there were three persons involved: himself, Austin and a "Chilly B." Although Wright knew that Austin was referred to by the nickname "Chill," Rankin maintained that "Chilly B." was a different person. Several days later, Wright spent eight hours driving Rankin around San Diego in an unmarked police van looking for "Chilly B."

Wright interviewed Rankin on two other occasions in early November. In those interviews Rankin admitted that "Chilly B." was not involved but that he had said so to protect Austin. At trial Rankin testified that the day before he first spoke with Wright, Austin and Elliott told him that the police would be talking to him soon. Austin warned both Rankin and Elliott that if anyone implicated him, "somebody's going to get hurt real bad . . . ." Rankin interpreted the statement as meaning that either he or Elliott would be killed. He believed the threat because Austin has previous ties to a gang. Although Rankin did not fear particularly for his own safety, he was concerned because Austin knew he had a wife and child. Rankin believed they were vulnerable because his ship was out to sea periodically and he would not

always be there to protect them.[4] As a result, he initially decided to go along with Austin's suggestion to blame "Chilly B."

DISCUSSION

I

*Instructional Issues*

*A. CALJIC No. 2.03*

■ Rankin takes issue with the trial court's giving of CALJIC No. 2.03, which tells the jury that if before trial "the defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, or crime, you may consider such statement as a circumstance tending to prove a consciousness of guilt." Rankin argues that his statements to Detective Wright concerning "Chilly B.," although admittedly false, do not show a consciousness of guilt but rather are the operative facts tending to prove the crime of being an accessory. He suggests that a defendant cannot be conscious of his guilt until after he has committed the crime.

Under most circumstances and certainly on the facts of this case Rankin is correct.[5] Assuming that Rankin's statements to Detective Wright are the only basis for finding him to be an accessory, they do not, as the People contend, also indicate his consciousness of guilt as to that crime.[6] Of course, Rankin was also charged with fraudulently using the credit card, a crime which

---

[4]Later, Rankin became more fearful when he returned home one day "and it looked like somebody had tried to take the whole door off." He unsuccessfully sought the assistance of his commanding officer in attempting to move his family to another location. He then arranged to have his wife stay with a friend and, after he had saved some money, they moved to an apartment in El Cajon.

[5]We can conceive of situations in which a false statement made before the crime was technically committed might nonetheless indicate a consciousness of guilt. For instance, suppose a defendant is waiting for confederates to arrive to assist him in burglarizing a building. When asked by a patrolling police officer what he is doing, the defendant gives a plausible (but false) response and the officer leaves. After the burglary, police investigators discover that the statement made by the defendant to the patrolling officer was false. We suspect the statement would be admissible to show a consciousness of guilt even though the crime had not yet been committed.

[6]At trial the prosecutor also argued that Rankin's liability as an accessory could be based on Elliott's testimony that Rankin threw some items from the purse away or on his assisting Austin in disposing of the credit card at the Gym Bag. We do not see how leaving a credit card in a store could be viewed as helping Austin escape arrest and conviction. (See § 32.) And if Rankin's liability were based solely on his disposing of the contents of the purse, it is difficult to see how his statements to Wright about "Chilly B." concern the crime with which he was charged.

occurred several days before he spoke with Detective Wright. Yet Rankin's false statement about where he obtained the card does not really concern his liability for using the card—he never denied he knew the card was stolen—and in any event does not reflect a consciousness of guilt. It had the same effect as if he falsely told Wright he ate a chocolate rather than vanilla ice cream cone while at the mall.

More crucially, however, CALJIC No. 2.03 should never be given unless it can be inferred that the defendant made the false statement for the purpose of deflecting suspicion from himself, as opposed to protecting someone else. (See, e.g., *People* v. *Louis* (1984) 159 Cal.App.3d 156, 160 [205 Cal.Rptr. 306] ["[T]he giving of CALJIC No. 2.03 is justified when there is evidence that a defendant fabricated a story to explain his conduct."].[7]) Only under such circumstances does a false statement indicate a consciousness of the defendant's *own* guilt, thus becoming admissible against *him*.

The People respond that CALJIC No. 2.03 was warranted because of false pretrial statements made by Rankin other than the references to "Chilly B." The examples cited, however, consistently involve attempts by the prosecutor to impeach Rankin's inexact trial testimony by pointing to more specific pretrial statements. Rankin readily admitted his memory of the events may have been clearer at an earlier time. In effect, the prosecutor was arguing that Rankin's prior statements were true and that his trial testimony was conveniently unspecific. Certainly no inference of a consciousness of guilt may be drawn from Rankin's pretrial statements in that circumstance.

We nonetheless cannot conclude that the error in giving CALJIC No. 2.03 was prejudicial. The inference of guilt suggested by the instruction is a permissive one. The jury is admonished that "such conduct is not sufficient by itself to prove guilt, *and its weight and significance, if any, are matters for your determination.*" (Italics added.) As we have explained, the false statements here simply do not show any consciousness of guilt. Under these circumstances, the error in giving the instruction was harmless. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

B. *CALJIC No. 2.11.5*

In our earlier opinion we faulted the trial court for failing to give CALJIC No. 2.11.5, which admonishes the jury not to consider whether or why others shown by the evidence to be involved are not being prosecuted for the same crime. Elliott did not testify for the prosecution in the first trial. Relying on

---

[7]*Louis* was disapproved on a different ground in *People* v. *Mickey* (1991) 54 Cal.3d 612, 672, footnote 9 [286 Cal.Rptr. 801, 818 P.2d 84].)

*People* v. *Carrera* (1989) 49 Cal.3d 291, 312-313 [261 Cal.Rptr. 348, 777 P.2d 121], Rankin now contends that the instruction should not have been given because Elliott testified in the second trial. In *Carrera*, the Supreme Court reaffirmed that CALJIC No. 2.11.5 should not be given when a nonprosecuted participant testifies because the jury is entitled to consider the lack of prosecution in assessing the witness's credibility.

 The predicate for the *Carrera* reasoning is that a *nonprosecuted* participant in the crime has testified. That predicate is unsatisfied here where the jury was told that Elliott had been charged and pleaded guilty to being an accessory. (See *ante*, fn. 3.) Under these circumstances, it was quite clear to the jury that CALJIC No. 2.11.5 referred to William Austin's participation in the crime. Because Austin did not testify, the court did not err in giving the instruction.

I.C.-II*

. . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

Judgment affirmed.

Work, J., and Froehlich, J., concurred.

---

*See footnote, *ante*, page 430.