Filed 8/18/14  P. v. Emory CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B251821 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA395791) |
| v. | |
| SAUNE EMORY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Rand S. Rubin, Judge.  Affirmed.

A. William Bartz, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Shawn McGahey Webb and Jonathan J. Kline, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted defendant Saune Emory of first degree residential burglary. (Pen. Code, § 459.)[1] In a bifurcated proceeding, defendant admitted that he had suffered a prior conviction of a serious felony. (§ 667, subd. (a)(1).) The trial court sentenced defendant to a total of 17 years in state prison, consisting of the high term of six years, doubled pursuant to the "Three Strikes" law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), plus five years pursuant to section 667, subdivision (a)(1).

Before trial, the court dismissed (pursuant to § 1385) a second count alleged against defendant of receiving stolen property (§ 496, subd. (a)). In addition, prior to resting its case, the prosecution moved to dismiss a special allegation that defendant committed the burglary for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1)(B).)[2]

On appeal, defendant contends that his conviction should be reversed because the prosecutor told the jury during her opening statement that it would hear evidence regarding defendant's gang affiliation, but she offered no such evidence during trial. He argues this prejudicially tainted the jury so that he did not receive a fair trial. He further asserts that the trial court erroneously instructed the jury regarding consciousness of guilt in a manner that improperly shifted the burden of proof. Because we conclude that the prosecutor's statements were not prejudicial given the overwhelming evidence of guilt and that the instructions were proper, we affirm.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The trial court previously had denied the defense motion to bifurcate the gang allegation.

2

**FACTUAL BACKGROUND**

## I.     Prosecution Evidence

At 1:30 p.m. on March 12, 2012, Kon Sok Chae received a phone call from his wife telling him their home security alarm had been activated. Chae quickly went home. When he arrived, he heard the security alarm going off. He listened at the front door and heard men talking inside and rummaging sounds. He was afraid to enter, so he went to the back of the house and shouted, "Anybody inside? Anybody inside?" He heard someone say, "Oh, shit, let's get out, let's get out, get out." Chae started toward the front of the house and saw two young Black males running out of his house. He could see that each of them was holding something as they ran but he could not see their faces. He tried to chase them but they were too fast. Chae called the police. His son was with him, and his daughter and son-in-law arrived shortly thereafter. The four of them entered the house and saw the house in disarray. Items were strewn all over the floor, and the beds were turned over. Chae heard a phone vibrating in the living room and saw an unfamiliar phone on the floor. It apparently had fallen in a gap between the couch and a bay window that had its screen removed and was standing open. His daughter picked up the phone and showed it to him, and the screen indicated that it was "Mom" calling. He also found a glove he did not recognize. The family discovered that a camera worth about $6,000 was missing, as well as a laptop, various items of jewelry, and two watches belonging to Chae's son.

Officers Jessica Neal and Daniel Rodriguez responded to Chae's call. Officer Neal noticed that the front window of the home was open and the window screen was on the ground nearby. She walked through the home and saw that it was in disarray. She noticed there was dirt leading from the ground floor to the upstairs.

Detective Paul Quan investigated the cellular phone found in Chae's home. After obtaining a search warrant, Detective Quan viewed the phone and downloaded its contents. There were numerous self-portraits of defendant stored in the phone. He discovered that the telephone number assigned as "Mom" belonged to Angela Emory,

defendant's mother. An entry listed as "James" was identified as defendant's uncle. The phone had recorded a missed call from James around the time of the burglary.

In late March 2012, plainclothes officers conducted surveillance at Angela Emory's home. On March 30, 2012, a member of the surveillance team, Officer Scott Cook, stopped defendant and arrested him. Officer Cook searched defendant pursuant to his arrest and found one of Chae's son's watches in the pocket of defendant's jacket.

As Officer Brent Hopkins escorted defendant from the police department to the jail, defendant said, "Damn, you got me dead bang, don't you?" He continued, "Fuck, this isn't going to be a D.A. reject, is it? I mean, this is the kind of thing where you can bring it in and they look at it and they say, wow, this is something I can really work with, isn't it?" He calmly and casually said, "So my DNA and my phone were at the scene, but that doesn't necessarily mean I was there, right? I mean, like maybe I was there, but I wasn't committing the burglary. Is that something that a lawyer could work with?" Officer Hopkins was not prompting defendant to converse and did not want to continue the conversation. He simply said he was not the investigator and he did not know details about the case. Nonetheless, defendant continued, saying, "I need to get myself one of those thousand dollar lawyers or I'm looking at some serious time. . . . That's okay, I'll do my time like a man. It's better to do it in the pen than to sit here in jail." Officer Hopkins discussed the conversation with another officer and immediately went to speak to Detective Quan.

## II. Defense Evidence

At trial, defendant admitted that the cellular phone found in Chae's home belonged to him and that he had taken pictures of himself with that phone. He testified that a few days before March 12, 2012, he had loaned his phone to a friend. When defendant saw the friend again, the friend did not return his phone but gave him a watch in its place. Defendant planned to sell the watch to buy another cellular phone. He refused to divulge the name of the friend to whom he had loaned his phone.

4

Defendant testified that on March 12, 2012, his mother had driven him to his grandmother's home around 11:00 a.m., where he spent the entire day and stayed overnight taking care of his son. His mother stayed with him until about 4:00 p.m. While there, he used his mother's cellular phone to call his phone to try to locate the friend to whom he had loaned his phone.

Defendant admitted that when he was arrested on March 30, 2012, he had Chae's son's watch in his jacket pocket. He testified that he initially lied and told the police he had bought the watch from "a smoker" (a "crackhead") because he did not want to be pressured to tell the police the name of his friend who had given him the watch.

Defendant said that when speaking to Officer Hopkins as the officer escorted him to jail, defendant was joking around and "wasn't being too serious." He admitted to making all of the statements to which Officer Hopkins had testified, but he said he did so because he thought Officer Hopkins seemed "pretty cool" and would know the law and could probably give him an answer. He said he would man up and do the time because he was not going to tell the police the name of his friend.

Defendant testified that on March 12, 2012, he did not go into anyone's home and take anything. He admitted that he had been convicted of robbery in January 2011.

## DISCUSSION

### I.    Prosecutorial Misconduct

Defendant contends that reversal of the judgment is required because during opening statement the prosecutor committed misconduct by telling the jury that it would hear evidence that the burglary was committed in association with and for the benefit of a criminal street gang, but then dismissed the gang allegation and failed to present any evidence in support of gang affiliation. We conclude that defendant forfeited the issue by failing to object in the trial court. Defendant argues that to the extent his trial counsel failed to object or move for a mistrial on the basis of the prosecutor's misconduct, he rendered ineffective assistance of counsel. Even assuming without deciding that his

5

counsel was ineffective for failing to object, we conclude such failure did not result in prejudice given the overwhelming evidence of guilt, and therefore reversal of the judgment is not required.

### A.    *The Relevant Proceedings*

A gang expert, Los Angeles Police Officer Jonathan Miller, testified at the preliminary hearing held in early August 2012 that defendant was a member of the Schoolyard Crips gang and that he committed the burglary on behalf of and for the benefit of the gang. The magistrate found there was sufficient cause to believe the gang allegation was true and denied the defense motion to dismiss the allegation. Accordingly, in the charging information filed in late August 2012, a special allegation pertaining to the residential burglary count was stated against defendant pursuant to section 186.22, subdivision (b)(1)(B), that the offense was committed for the benefit of and in association with a criminal street gang.

At trial, the trial court read the charges to the prospective jury, including the gang allegation, making clear that the prosecution had the burden of proving the allegations beyond a reasonable doubt. During voir dire, when the court asked if anyone would have difficulty being fair and impartial, two prospective jurors indicated they would have difficulty because they had had prior negative encounters with gang members. One said he had been victimized several times by gang members, and if someone were in a gang he would expect that person to be guilty. Another juror said he had been the victim of gang violence on a daily basis for two years. The parties stipulated to excuse both prospective jurors.

The prosecutor then said during her opening statement: "[T]here's another part in this case, and you are going to hear evidence about a gang allegation. You are going to hear evidence that Mr. Emory is a member of the Schoolyard Crips, which is a violent criminal street gang, and that one of the things the Schoolyard Crips has been doing, one of the trending crimes, is something called flocking. Flocking is when young gang members go outside of their territory and commit residential burglaries in nicer, wealthier

6

neighborhoods. It's an easy way to get cash. It's an easy way to get property. It's an easy way to get nice things that you either wear or you sell, because in gang culture reputation is everything. Reputation and respect. And this is something that is recently trending with gangs. In particular, the Schoolyard Crips are known for flocking. They send the young gang members in to commit these burglaries, quick easy money, to fund the gang's activities, guns, parties, court costs, recruitment. And you're going to hear evidence that this residential burglary, because of certain factors, is committed for the benefit of the Schoolyard Crip[s] criminal street gang."

During trial, the trial court conducted an Evidence Code section 402 hearing to address the admissibility of evidence regarding Douglas Mucker, who was alleged to be a fellow gang member and the man with whom defendant committed the burglary.[3] The prosecutor stated she intended to call gang expert Officer Miller to testify that he spoke with the DNA analyst who told him that Mucker's DNA was recovered from the glove found at the Chae home. Officer Miller would rely on that evidence to opine that the burglary was committed for the benefit of the Schoolyard Crips gang.

The trial court indicated it would not allow Officer Miller to testify that Mucker's DNA was found on the glove because that evidence had not been provided to the defense. In addition, the court held that Officer Miller could not testify to his conversation with the DNA analyst because it was hearsay. The prosecutor stated that she would lose credibility with the jury if she did not produce evidence linking two gang members to the burglary, and as a result of the court's evidentiary ruling proceeded to bring a motion to dismiss the gang allegation.

Defense counsel offered no objection when the prosecutor dismissed the gang allegation. Nor did she bring a motion for mistrial at the close of the evidence. Defendant's new trial motion was the first assertion of a claim of prosecutorial

---

**3** Defendant's counsel argued for the first time during oral argument that the prosecutor initiated the section 402 motion to discuss the admissibility of her proffered gang evidence, and that this shows she knew her evidence was questionable. However, the record clearly demonstrates that defense counsel brought the section 402 motion at issue.

misconduct based on the prosecutor's references to gang affiliation during her opening statement.

The prosecution did not mention anything about gangs for the remainder of the trial. Pursuant to the prosecution's request, the court instructed the jury that "[t]he allegation that the crime was committed for the benefit of, at the direction of or in association with a criminal street gang no longer needs to be decided in this case. [¶] Do not speculate about or consider in any way why you no longer need to decide this allegation." The court also instructed the jury that "[n]othing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence."

### B. Analysis

As defendant points out, where the prosecution asserts facts during opening statement knowing such facts cannot be proved, such statements of fact followed by no offer of proof constitute misconduct. (*People v. Purvis* (1963) 60 Cal.2d 323, 346, overruled on other grounds as stated in *People v. Morse* (1964) 60 Cal.2d 631, 642.) However, *Purvis* is distinguishable because there the prosecutor knew when he made his opening statement that his assertions would not be supported by evidence. The prosecutor was therefore guilty of misconduct and bad faith, and reversal was required on that basis. In contrast here, while the prosecutor may not have *reasonably* believed that DNA evidence (linking defendant's fellow gang member to the glove found at the Chae residence) could be admitted by way of Officer Miller's hearsay testimony, the trial court did not doubt the prosecutor's credibility in proceeding as she did. Indeed, the court assured the prosecutor that she had not "lost any credibility with this court." From the record, it appears that at the time she promised the jury that it would hear gang evidence, she fully intended to present such evidence.

In any event, it is unnecessary for us to decide if the prosecutor committed misconduct here. Even assuming without deciding that misconduct occurred, defendant has forfeited this argument for purposes of appeal by failing to object at trial, either when

8

the prosecutor made the opening statement or when the prosecutor moved to dismiss the allegation. Defense counsel also did not move for a mistrial.[4] "To preserve a misconduct claim for review on appeal, a defendant must make a timely objection and, unless an admonition would not have cured the harm, ask the trial court to admonish the jury to disregard the prosecutor's improper remarks or conduct." (*People v. Martinez* (2010) 47 Cal.4th 911, 956.) The trial court here was given no opportunity to address the alleged misconduct and cure any potential harm.

Defendant contends that even if we conclude that he forfeited his claim of prosecutorial misconduct, the claim is still cognizable on appeal under the rubric of ineffective assistance of counsel based on defense counsel's failure to move for a mistrial. We conclude, however, that defendant has not demonstrated ineffective assistance of counsel. "'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citations.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." [Citations.]'" (*In re Avena* (1996) 12 Cal.4th 694, 721; see *Strickland v. Washington* (1984) 466 U.S. 668, 687-694 (*Strickland*); *People v. Cunningham* (2001) 25 Cal.4th 926, 1003.) However, the assessment of prejudice is not "solely one of outcome determination. Instead, the pertinent inquiry is 'whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.' [Citation.]" (*Avena*, *supra*,

---

**4** We reject defendant's argument that his request to bifurcate the trial of the gang allegations was equivalent to an objection to the prosecutor referring to the gang evidence in her opening statement. Seeking bifurcation to avoid the jury hearing about gang affiliation when considering the charged primary crime is wholly distinct from objecting on the ground that a prosecutor made a statement in opening remarks to the jury that she could not support with evidence.

12 Cal.4th at p. 721.) "[T]he petitioner must establish 'prejudice as a "demonstrable reality," not simply speculation as to the effect of the errors or omissions of counsel.'" (*In re Clark* (1993) 5 Cal.4th 750, 766.)

Where a defendant fails to show prejudice, a reviewing court may reject a claim of ineffective assistance of counsel without reaching the issue of deficient performance. (*Strickland*, *supra*, 466 U.S. at p. 697. See also *People v. Jacobs* (2013) 220 Cal.App.4th 67, 75-76.) We do so here. Even if we were to find defense counsel's performance deficient, it is not reasonably probable that a different result would have been reached. Considering the overwhelming evidence against defendant, the prosecutor's comments, even if improper, could not have contributed to the verdict and would not have been grounds for a mistrial. (See *In re Crew* (2011) 52 Cal.4th 126, 150.)

Defendant contends that the only evidence connecting him to the burglary was the fact his cell phone was found at the scene. Not so. Additional damning evidence included the fact that Chae's son's watch was found in defendant's pocket when he was arrested. Defendant's unsolicited statements to Officer Hopkins also supported the jury's finding of guilt. A reasonable inference from his statements was that he knew the case against him was extremely strong because his cell phone was found at the scene, giving the district attorney ample evidence with which to charge him. In his statements to the officer, he initially seemed to be attempting to create a defense, all but conceding that he was present at the scene but perhaps not participating in the burglary. However, he then opined that he needed an extremely capable lawyer and vowed to "do [his] time like a man." His explanations that a friend borrowed his cell phone and gave him the watch in its place, and that he was merely kidding around with Officer Hopkins, were predictably unconvincing to the jury in light of the strong evidence against him. In addition, by instructing the jury (1) to disregard the dismissed gang allegation and not speculate on its absence, and (2) that statements of counsel do not constitute evidence, the court in effect admonished the jury in a manner adequate to cure any harm from the prosecutor's remarks. The jury is presumed to follow the court's instructions and disregard any statements that were not based on the evidence produced at trial. (*People v. Smith* (2007)

10

40 Cal.4th 483, 517.) Thus, with or without the reference to gang involvement, the evidence was overwhelming that defendant was guilty of burglary. Accordingly, it is exceedingly unlikely the trial court would have granted a mistrial if defense counsel had requested one. Defendant successfully requested pro. per. status after the jury rendered its verdict and brought a motion for new trial based on the alleged prosecutorial misconduct, which motion the trial court denied. Defendant has not shown there is a reasonable probability that, but for the prosecutor's reference to gang affiliation and defense counsel's failure to move for a mistrial on that basis, the result of the proceedings would have been different.

## II.     Instruction Regarding Consciousness of Guilt (CALCRIM No. 362)

Defendant further contends that the trial court committed error by instructing the jury using CALCRIM No. 362 regarding consciousness of guilt because the instruction improperly shifted the burden of proof and violated his state and federal constitutional rights to a jury trial and to due process. We disagree.

### A.     *The Relevant Proceedings*

Defendant testified at trial that he loaned his cell phone to a friend, and a few days later the friend no longer had the cell phone but gave him a watch as a replacement for the cell phone. Defendant refused to divulge the name of the friend to whom he loaned his cell phone and from whom he received the watch. Defendant admitted that at the time of his arrest he told the investigating officer that he bought the watch from a crackhead for $20.

Defense counsel objected to the court giving CALCRIM No. 362 regarding consciousness of guilt and false statements. He argued that the bench notes for the instruction indicate that, pursuant to *People v. Rankin* (1992) 9 Cal.App.4th 430 (*Rankin*), it is error to give the instruction where a defendant lied to protect an accomplice. Counsel argued that defendant testified he made a false statement to the police because he did not want to give any names to get anyone in trouble.

11

The trial court disagreed with counsel regarding the state of the evidence. The court reasoned as follows: "We don't have any evidence that at the time he received the watch that he thought it was stolen. If we did, he'd probably be charged with receiving stolen property. He's not at this point. Also we don't have any information that the defendant knew anything about this burglary at the time he was interviewed or that the watch was stolen, so why would he make up a story? I think it's very different than *Rankin*, which dealt with an accomplice, if I remember correctly, or accessory after the fact. We've got a different situation here. Had the defendant said something like, you know, I got it from a friend that I won't tell you the friend's name, like he said on the stand, I wouldn't give this instruction. But he made up a whole other scenario about he bought it for $20 from a crackhead or something that is really not a story to protect the friend. He didn't have to say anything. I think the jury has a right to evaluate that, and I'm going to give instruction 362."

CALCRIM No. 362, as read to the jury, states as follows: "If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."

### B.     Analysis

In *Rankin*, *supra*, 9 Cal.App.4th 430, the defendant was convicted of being an accessory after the fact to a robbery committed by William Austin, also known as "Chill," and of acquiring a credit card that had been taken in the robbery. Defendant used the card three days after the robbery. When questioned by a police officer shortly thereafter, he said that three people were involved in the use of the credit card: himself,

12

Dwayne Elliott, and someone named "Chilly B."[5]  (*Id.* at p. 434.)  Later, he told the officer that "Chilly B." had not been involved, but said that he had lied to protect Austin. (*Ibid.*)

At trial, the defendant explained that before his first statement implicating "Chilly B.," Austin had implicitly threatened to kill him.  Because the defendant was concerned for his family, he went along with Austin's plan to blame "Chilly B."  (*Rankin*, *supra*, 9 Cal.App.4th at pp. 434-435.)

Based on the defendant's false statement implicating "Chilly B.," the trial court gave CALJIC No. 2.03, the predecessor to CALCRIM No. 362.  The Court of Appeal held that the giving of the instruction was error.  The court reasoned in part: "[Defendant's] false statement about where he obtained the card does not really concern his liability for using the card—he never denied he knew the card was stolen—and in any event does not reflect a consciousness of guilt.  It had the same effect as if he falsely told [the police] he ate a chocolate rather than vanilla ice cream cone while at the mall.  [¶] More crucially, however, CALJIC No. 2.03 should never be given unless it can be inferred that the defendant made the false statement for the purpose of deflecting suspicion from himself, as opposed to protecting someone else.  [Citation.]  Only under such circumstances does a false statement indicate a consciousness of the defendant's *own* guilt, thus becoming admissible against *him*."  (*Rankin*, *supra*, 9 Cal.App.4th at p. 436, fn. omitted.)

As reasoned by the trial court, the instant case is distinguishable from *Rankin*.  In *Rankin*, the Court of Appeal concluded that the defendant's false implication of "Chilly B." did not indicate consciousness of the defendant's own guilt regarding the

---

[5]     The *Rankin* opinion contains an apparent misstatement:  "When Rankin was questioned by Detective Janet Wright on October 26, he . . . insisted there were three persons involved:  himself, *Austin* and a 'Chilly B.'  Although Wright knew that Austin was referred to by the nickname 'Chill,' Rankin maintained that 'Chilly B.' was a different person."  (9 Cal.App.4th at p. 434, italics added.)  It seems clear that the italicized name should have been Dwayne Elliott (Rankin's friend who pled guilty to accessory after the fact), rather than Austin, because Rankin later admitted that he had said Chilly B. was involved in order to protect Austin.  (*Ibid.*)

13

credit card charge, because the defendant never denied that he knew the credit card he used was stolen. In that circumstance, falsely identifying an accomplice who did not exist in the acquisition of the card did not suggest that the defendant was attempting to deflect suspicion from himself.

By contrast, here, defendant never suggested that he knew the watch was stolen. In that context, it could reasonably be inferred that by saying he obtained the watch from a crackhead, defendant sought not to protect an accomplice or an unnamed friend (whom he did not implicate in any crime), but to protect himself from being incriminated in the burglary. It can readily be inferred that he "made the false statement for the purpose of deflecting suspicion from himself, as opposed to protecting someone else." (*Rankin*, *supra*, 9 Cal.App.4th at p. 436.) As the trial court stated, "he made up a whole other scenario about he bought it for $20 from a crackhead or something that is really not a story to protect the friend. He didn't have to say anything."

The fact that evidence of the statement was introduced by defendant's own testimony does not affect the propriety of the instruction. Defendant's testimony was substantial evidence that the statement was made, and the evidence at trial was substantial evidence not only that the statement was false, but that defendant sought by the statement to deflect suspicion from himself concerning the burglary.

Beyond whether CALCRIM No. 362 was applicable under the factual scenario present here, defendant asserts that the instruction is constitutionally infirm because it provides "nonreciprocal benefits" to the prosecution. Defendant cites *Wardius v. Oregon* (1973) 412 U.S. 470, in which the United States Supreme Court stated that "state trial rules which provide nonreciprocal benefits to the State when the lack of reciprocity interferes with the defendant's ability to secure a fair trial" violate the 14th Amendment's guarantee of due process. (*Id.* at p. 474, fn. 6.) Defendant argues that instructions relating to a defendant's consciousness of guilt are constitutionally infirm because they invite jurors to consider certain types of evidence as indicating an accused's guilt of the charged offense without concurrent instructions pinpointing evidence which is indicative of his innocence. He points out that the California Supreme Court has forbidden

14

instructions which say that the lack of guilty conduct supports an acquittal. (See, e.g., *People v. Green* (1980) 27 Cal.3d 1, 38.)

As stated by the Supreme Court, we recognize that "[t]here should be absolute impartiality as between the People and the defendant in the matter of instructions, including the phraseology employed in the statement of familiar principles." (*People v. Moore* (1954) 43 Cal.2d 517, 526-527.) This does not mean, however, that the giving of CALCRIM No. 362 in the instant case was constitutionally infirm. "Our Supreme Court has squarely held that CALJIC No. 2.03 [the predecessor to CALCRIM No. 362] is not an improper 'pinpoint' instruction. (*People v. Arias* (1996) 13 Cal.4th 92, 143; *People v. Kelly* (1992) 1 Cal.4th 495, 531-532.) The court explained in *Kelly*, 'CALJIC No. 2.03 . . . does not merely pinpoint evidence the jury may consider. It tells the jury it may consider the evidence *but it is not sufficient by itself to prove guilt*. [Citation.] Defendant obviously does not quarrel with the emphasized language. If the court tells the jury that certain evidence is not alone sufficient to convict, it must necessarily inform the jury, either expressly or impliedly, that it may at least consider the evidence. . . . There was no error.' (*Kelly*, *supra*, 1 Cal.4th at pp. 531-532.) [¶] Although there are minor differences between CALJIC No. 2.03 and CALCRIM No. 362 . . . , none is sufficient to undermine our Supreme Court's approval of the language of these instructions." (*People v. McGowan* (2008) 160 Cal.App.4th 1099, 1103-1104, fn. omitted.)

Deliberately false statements by a defendant about matters materially related to his or her guilt or innocence "have long been considered cogent evidence of a consciousness of guilt, for they suggest there is no honest explanation for incriminating circumstances. [Citation.] Moreover, permitting the jury to draw an inference of wrongdoing from a false statement is as much a traditional feature of the adversarial fact finding process as impeachment by prior inconsistent statements. [Citations.]" (*People v. Williams* (2000) 79 Cal.App.4th 1157, 1167-1168.) Indeed, "[t]he inference of consciousness of guilt from willful falsehood . . . is one supported by common sense, which many jurors are likely to indulge even without an instruction. In this case, such circumstantial evidence of consciousness of guilt . . . would certainly have been argued—properly—by the

15

prosecutor even without the challenged instructions. To highlight this circumstantial evidence in the course of cautioning the jury against overreliance on it was not unfair to defendant." (*People v. Holloway* (2004) 33 Cal.4th 96, 142.)

Nor did the instruction lighten the prosecution's burden of proof. Indeed, "'[t]he cautionary nature of the instructions benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory.' (*People v. Jackson* (1996) 13 Cal.4th 1164, 1224; see also *People v. Kelly*[, *supra*,] 1 Cal.4th 495, 531.)" (*People v. Holloway*, *supra*, 33 Cal.4th at p. 142.) Thus, the instruction benefited defendant by informing the jurors it was up to them to decide the meaning and importance of any evidence of false statements and, no matter what the weight given to that evidence, the evidence could not be used by itself to prove guilt. In addition, the instruction's impartiality was strengthened when considered in light of other instructions requiring the prosecution to prove each element of the crimes beyond a reasonable doubt. We conclude there was no instructional error here.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, J.[*]

We concur:

EPSTEIN, P. J.                    WILLHITE, J.

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.