Filed 12/13/22 P. v. Figueroa CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B322584 |
| Plaintiff and Respondent, | Kern County |
| v. | Super. Ct. No. BF178319A |
| GREGORIO FIGUEROA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Kern County, Gregory A. Pulskamp, Judge. Affirmed.

Kevin Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, Timothy L. O'Hair, and Galen N. Farris, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

A jury convicted Gregorio Figueroa of assault with a deadly weapon and found true the allegation that Figueroa had personally inflicted great bodily injury upon the victim. On appeal, Figueroa contends that his conviction should be reversed because (1) the jury was instructed with three consciousness of guilt instructions that were unsupported by any evidence; and (2) the trial court abused its discretion in denying defense counsel's motion for a mistrial after a witness alluded to Figueroa's purported association with a gang. We conclude that substantial evidence supported the consciousness of guilt instructions and that the court did not abuse its discretion in denying the motion for mistrial. Further, even if Figueroa's claims of error had merit, any error was harmless. We therefore affirm the judgment.

## PROCEDURAL BACKGROUND

By information dated December 18, 2019, the Kern County District Attorney charged Figueroa with assault with a deadly weapon on Jesse Leal (Pen. Code,[1] § 245, subd. (a)(1); count 1) and with assault by means of force likely to produce great bodily injury on Brandy Rivera (§ 245, subd. (a)(4); count 2). For both counts, the information alleged that Figueroa personally inflicted great bodily injury upon the victims (§ 12022.7), causing both offenses to be serious felonies (§ 1192.7, subd. (c)(8)). It was further alleged that Figueroa had served three separate prior terms in a state or federal prison for felony offenses (§ 667.5, subd. (b)). The court dismissed the prison priors before trial.

---

[1] All undesignated statutory references are to the Penal Code.

2

The jury found Figueroa guilty of count 1 and not guilty of count 2. The jury also found true the allegation that Figueroa had inflicted great bodily injury on Jesse Leal.

The court sentenced Figueroa to the upper term of four years for assault with a deadly weapon enhanced by three years for personally inflicting great bodily injury. Figueroa timely appealed.

## FACTUAL BACKGROUND

### 1. Prosecution Evidence

On September 10, 2019, Rivera hosted a party at her house to celebrate her birthday. Rivera's sister, Vanessa Hernandez, Hernandez's eleven-year-old daughter, J.C., and Hernandez's boyfriend, Figueroa, were in attendance, as were several of Rivera's coworkers. While the guests gathered in the garage to sing "Happy Birthday" to Rivera, Figueroa attempted to push her face into the birthday cake. The table slid and Rivera's head hit the edge of the table instead. Rivera went inside the house to collect herself. Rivera's husband, Christopher Garcia, confronted Figueroa and they walked out into the driveway to speak. Figueroa asked if Garcia wanted to fight and Garcia replied that he just wanted Figueroa to leave the party. Rivera's manager, Bryan Leal,[2] approached Garcia to encourage him not to get into a fight at his wife's birthday party. Garcia agreed and the two men were turning back to the garage when Figueroa struck Bryan in the face, knocking him to the ground. Bryan's brother, Jesse, approached Figueroa and the men fought briefly before

---

[2] Because Bryan and Jesse Leal share a last name, we refer to both by their first names. We intend no disrespect.

3

Garcia broke them up. Jesse told Figueroa that he was not interested in fighting anymore and that Figueroa should leave, then went to sit inside his brother's car.

Rivera returned to the party and repeatedly asked Figueroa and Hernandez to leave. Figueroa struck Rivera in the face, knocking her to the ground. Several men, including Garcia, Bryan, and Jesse, started to punch and kick Figueroa. Once the fight broke up, most guests returned to the garage to attend to Rivera. Jesse went to smoke a cigarette near the corner of the garage, on the grass between Rivera's house and her neighbor's. He and his brother believed that Figueroa had left. However, Figueroa approached Jesse again and the two briefly fought before Figueroa stabbed Jesse in the throat and slashed him on the stomach and the back. He left the scene in Hernandez's car. Jesse returned to the garage, bleeding profusely from his wounds. He was hospitalized for over a week and had lasting paralysis of the left side of his face due to his neck injury.

## 2.    Defense Evidence

Figueroa, Hernandez, and J.C. testified for the defense. After Hernandez informed Rivera that she, Figueroa, and J.C. had to leave the party, Rivera brought out the cake. While everyone sang "Happy Birthday," Figueroa touched the back of Rivera's head. Rivera was intoxicated and slipped forward and hit her chin on the table. Everyone at the party got upset with Figueroa. Figueroa apologized to Rivera and to Garcia. The two men were speaking in the driveway while Hernandez backed her car out with J.C. in the back seat. Garcia asked Figueroa repeatedly "Why did you do that?" Bryan then approached and got in Figueroa's face and told him to calm down. Figueroa pushed Bryan's face away and then Jesse ran up and punched

4

Figueroa. Jesse then got inside a car. When Figueroa asked who had hit him and approached the car where Jesse was sitting, Jesse again rushed at Figueroa and began to hit him. After Jesse got off of Figueroa, Rivera came up from behind Figueroa and asked him to leave. She grabbed his arm and Figueroa was startled and turned around and swung at her. Rivera fell to the ground but was not knocked unconscious. Immediately, all the men at the party ran up and began hitting, kicking and punching Figueroa. Figueroa was knocked unconscious during part of this beating.

Figueroa attempted to get up several times, bracing himself against Hernandez's car. He eventually stood and took the pocket knife from his utility belt, holding it out to scare off those attacking him. Figueroa then addressed Garcia, asking why he had hit him. As Hernandez was urging Figueroa to leave, Jesse ran and tackled him again. While the two were on the ground, Jesse punched Figueroa and attempted to get the knife from him. The knife ultimately came out of Figueroa's hand and Jesse got off him, at which point Figueroa got into Hernandez's car and left.

Figueroa was arrested that evening and informed the officer that he had been knocked out. He testified that he "may have" also told the officer that he did not know what happened that night because he was knocked out.

### 3. Rebuttal Evidence

Bakersfield Police Officer Frederick Martinez interviewed J.C. on the evening of September 10, 2019. J.C. informed Officer Martinez that Figueroa had been jumped by three to four men. She also stated that Hernandez told Figueroa to get into the car so they could leave, but that Figueroa continued to challenge

5

multiple individuals to a fight. J.C. told the officer that Figueroa stabbed an unknown person in the back and stabbed Garcia on the arm. She stated that she believed that Figueroa was at fault because others asked him to leave but he continued to challenge people to a fight.

## DISCUSSION

Figueroa contends that the trial court erred in instructing the jury that false statements, the fabrication of evidence, and flight from the scene, if supported by the evidence, could support an inference of consciousness of guilt, as there was insufficient evidence to support these instructions. He further contends that the court erred in denying his motion for mistrial following a witness's allusion to his affiliation with a gang. We disagree with both contentions and affirm.

## 1.  The court did not err in instructing the jury on consciousness of guilt.

For consciousness of guilt instructions to be given, "facts giving rise to an inference of consciousness of guilt" do not need to be conclusively established; "there need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102; *People v. Bowman* (2011) 202 Cal.App.4th 353, 366 [same].)

"It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) Such an error is subject to the state law test under *People v. Watson* (1956) 46 Cal.2d 818. (*Guiton*, at p. 1130.) Under this test, we determine, based on our examination of the entire record,

6

whether it is reasonably probable that the defendant would have achieved a more favorable verdict had the trial court not given the instruction. (*Id.*; see *People v. Rankin* (1992) 9 Cal.App.4th 430, 436 [applying *Watson* standard of review to error in giving CALJIC No. 2.03, precursor to CALCRIM No. 362]; *People v. Turner* (1990) 50 Cal.3d 668, 695 [applying *Watson* standard of review when court instructed jury with CALJIC No. 2.52, precursor to CALCRIM No. 372].)

We conclude that sufficient evidence to support the consciousness of guilt instructions was present here and the instructions were properly given. Even if we were to assume that the evidence was insufficient, we conclude any instructional error was harmless.

### 1.1. CALCRIM No. 362

### 1.1.1. Additional Facts

The prosecutor requested that the jury be instructed with CALCRIM No. 362, which states: "If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show that he was aware of his guilt of the crime and you may consider it in determining his guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance; however, evidence that the defendant made such a statement cannot prove guilt by itself."

The court's tentative decision was to delete CALCRIM No. 362 from the instructions. The court explained: "This is when a defendant makes statements prior to the trial which are objectively false. Now, not just maybe having an argument over credibility. It's something that is objectively false and from that

the jury's allowed to infer consciousness of guilt. For example, if somebody gives a false name at the scene, that's a classic example, and it's proven up definitively that it's not the person. [¶] Here I couldn't think of anything . . . ."

The prosecutor argued that the evidentiary basis for the instruction was that Figueroa "said that he was knocked unconscious and didn't remember anything, which is completely contrary to his testimony." The prosecutor referred the court to Figueroa's testimony concerning what he had told the police officer after he was arrested.

Defense counsel argued that testimony supported that Figueroa was in and out of consciousness. He asserted that the statement to the officer was supported by the evidence and, by the time Figueroa testified at trial, "he had more of a recollection."

The court reconsidered its tentative and concluded: "I think there is a sufficient factual basis in the record to justify giving that instruction."

In addition to CALCRIM No. 362, the court instructed the jury with CALCRIM No. 200, which states, in relevant part: "You must decide what the facts are. It is up to all of you, and you alone, to decide what happened based only on the evidence that has been presented to you in this trial. [¶] . . . [¶] Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them."

### 1.1.2. Analysis

In determining whether CALCRIM No. 362 was properly given, we consider whether there was any evidence in the record that could support the conclusion that Figueroa made a false statement before trial. (See *People v. McGowan* (2008) 160 Cal.App.4th 1099, 1104 ["trial court properly left it for the jury to determine whether defendant's statement to police was false or deliberately misleading, and if so, what weight should be given to that evidence"].) Figueroa conceded that, at the time he was arrested, he "may have" told a police officer that he did not remember what happened because he had been knocked out. If the jury believed that Figueroa told the officer he did not recall what happened, his testimony at trial explaining the events of that night in detail would suggest that his earlier statement was untrue. This was sufficient grounds to provide the instruction. Contrary to Figueroa's suggestion, we cannot properly reweigh the evidence and determine that the instruction was improper because what he told the officer was "true."

Even if we assume that the court erred in instructing the jury with CALCRIM No. 362, Figueroa suffered no prejudice. It is not reasonably probable that Figueroa would have achieved a more favorable result had the instruction not been given. Testimony from multiple witnesses who attended the party supported that the stabbing was not accidental or in self-defense but was the result of Figueroa initiating another fight with Jesse after refusing to leave. The consciousness of guilt instructions had no bearing on this testimony.

Moreover, "the jury need not believe the prosecution's evidence suggesting that the statement was false, and even if it finds that the statement was false, it need not conclude that

9

defendant deliberately lied to hide his complicity in the crime." (*People v. Kimble* (1988) 44 Cal.3d 480, 498.) "CALCRIM No. 362 *limits* the reach of any adverse inference both by telling the jury that it decides the 'meaning and importance' of the evidence and by telling the jury the making of a willfully false statement 'cannot prove guilt by itself.' [Citation.] CALCRIM No. 362 . . . is [thus] designed to benefit the defense, ' "admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory." [Citation.]' [Citation.] And because the evidence cannot prove guilt by itself, a jury would understand that the consciousness of guilt—however deep it ran—was not the equivalent of a confession. [Citation.] Thus, a jury would understand both that false statements were not the equivalent of a confession and that they were not themselves sufficient to prove guilt of the charged crimes." (*People v. Burton* (2018) 29 Cal.App.5th 917, 925.) The jury was also instructed by CALCRIM No. 200 that some instructions might not apply, depending on the jury's findings of fact, and that it should not assume anything about the facts just because the court gave a particular instruction. "We presume jurors understand and follow the instructions they are given." (*People v. Buenrostro* (2018) 6 Cal.5th 367, 431.)

In sum, in light of the conditional nature of CALCRIM No. 362, the court giving CALCRIM No. 200, and our consideration of the entire record, we conclude that any error was harmless.

### 1.2. CALCRIM No. 371

#### 1.2.1. Additional Facts

CALCRIM No. 371 provides, in relevant part: "If the defendant tried to create false evidence or obtain false testimony, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance; however, evidence of such an attempt cannot prove guilt by itself. [¶] If someone other than the defendant tried to create false evidence, provide false testimony, or conceal or destroy evidence, that conduct may show the defendant was aware of his guilt, but only if the defendant was present and knew about that conduct, or, if not present, authorized the other person's actions. It is up to you to decide the meaning and importance of this evidence; however, evidence of such conduct cannot prove guilt by itself."

J.C. testified that her mother had helped her practice questioning concerning what is a truth and what is a lie and helped her come up with examples. She also testified that she had lied to the police officer she spoke to the night Figueroa was arrested. She did not recall what she lied about but stated, "I remember my mom told me it was something important [¶] . . . [¶] She told me that what I had said was one of the cases why this is going on or is one of the reasons why this is happening . . . ." When asked again to confirm that she did not remember what she lied about to the officer, J.C. stated, "No, I just remember my mom saying—telling me that what I said—or why did I say the stuff that I said because some of it wasn't true. She said now because of what I said, all of this is going on." J.C. also testified that she lived with Figueroa and would see him that evening after her testimony.

Hernandez testified that she discussed J.C.'s testimony with her, but only to tell J.C. that "she has to tell the truth when she testifies." Hernandez also testified that she had discussed the case with Figueroa, stating: "Just our future, planning to buy a house. We have to wait for the case is over. I can't afford a house without him, you know, so we can't go do anything else. We can't have a life, trying to have a baby. We can't do any of that. So yeah, we've been talking about it."

While discussing jury instructions with counsel, the court explained that its tentative was to allow CALCRIM No. 371, alternatives B and C. With regards to alternative B, the court explained, "I think there is some evidence, based on the evidence, and reasonable inferences from that evidence that the defendant did try to create false evidence or obtain false testimony and the jury may conclude from that an attempt to—can infer negative inferences from that effort to basically create false evidence."

With respect to alternative C, the court stated, "[T]hat's fabrication by a third party, and specifically what I had in mind there is not the defendant himself, but Ms. Vanessa Hernandez as it relates to her daughter. I think that makes that instruction, alternative C, appropriate. [¶] [J.C.] that [*sic*] testified that her mother did tell her, for example, that the basis for the prosecution was pretty much her fault based upon what she said to the officers, or words to that effect, and from that I think it's a reasonable inference that she had applied pressure to [J.C.] to tell the jury something different than what she told the police officers."

The court acknowledged that there was no express testimony from J.C. that Figueroa had influenced her testimony, but observed that "there's a very strong inference, since they're a

family and her mother is engaged with the defendant and she lives with the defendant, that that pressure may have come from the defendant as well." Consistent with its tentative, the court instructed the jury with alternatives B and C to CALCRIM No. 371.

### 1.2.2. Analysis

We conclude that there was sufficient evidence to support giving alternatives B and C to CALCRIM No. 371. As the Attorney General contends, alternative B to CALCRIM No. 371, which addresses actions by the defendant to create false evidence, was supported by Figueroa's testimony that he told a police officer that he had been unconscious and did not recall anything. As discussed above, a jury could reasonably conclude from the fact that Figueroa was later able to testify as to the events of that evening in detail that these statements were false. Our Supreme Court previously concluded that "[t]here is no reason why a false statement designed to conceal inculpatory evidence cannot be the basis for giving" CALJIC No. 2.06, the predecessor to CALCRIM No. 371. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1225.) Further, as the court noted, the jury could reasonably infer that Figueroa had an opportunity to influence the testimony of Hernandez and J.C. because they all lived together, including during the trial, and because Figueroa's plans with Hernandez (i.e., buying a house, having a child) were on hold unless he was acquitted.

There is also sufficient evidence supporting the court's use of alternative C to CALCRIM No. 371, which addresses the creation of false evidence, provision of false testimony, or concealment or destruction of evidence by a third party in the defendant's presence or with their authorization. J.C. testified

13

that Hernandez told her that she had lied when she told police that the stabbing was Figueroa's fault and that J.C.'s statement was the reason that Figueroa was being tried. Hernandez also testified that she had discussed J.C.'s testimony with her before trial. This evidence supports that Hernandez influenced J.C.'s testimony to benefit Figueroa. Because Figueroa lived with Hernandez and J.C., a finder of fact could reasonably infer that he was either present and aware that these conversations were taking place or asked Hernandez to influence J.C.'s testimony.

Even if there were no substantial evidence to support the instruction, there was no prejudice to Figueroa. As discussed above, there was strong evidence against Figueroa from multiple other witnesses. CALCRIM No. 371 also told the jury that evidence of creating or concealing evidence, if any existed, was not sufficient itself to prove guilt and left it to the jury to determine its "meaning and importance" and "whether the inference [of consciousness of guilt] should be drawn in light of the whole record; and . . . how the evidence is to be weighed." (*People v. Mackey* (2015) 233 Cal.App.4th 32, 113.) "The cautionary nature of the instruction[ ] benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory." (*People v. Jackson*, *supra*, 13 Cal.4th at p. 1224.)

CALCRIM No. 200 also made clear to the jury that it could disregard instructions that were irrelevant to its factual findings. In *People v. Avila* (2009) 46 Cal.4th 680, at pages 709–710, the Supreme Court assumed without deciding that the court had erred by instructing the jury with CALJIC No. 2.06, a precursor to CALCRIM No. 371, but concluded that the error was harmless where "[t]he jury was also instructed that '[w]hether some

instructions apply will depend on what you find to be the facts. Disregard any instruction which applies to facts determined by you not to exist. Do not conclude that because an instruction has been given, I am expressing an opinion as to the facts.' "

The conclusion that the instruction was not prejudicial, even if unsupported by substantial evidence, is further supported by one of the cases on which Figueroa relies, *People v. Kerley* (2018) 23 Cal.App.5th 513. The court in *Kerley* concluded that the evidence was insufficient to support that the defendant authorized or was present when his mother purportedly wrote a letter to police implicating another person as the victim's murderer. (*Id.* at pp. 564–566.) However, the court concluded that the "error was rendered harmless by the balance of the instruction." (*Id.* at p. 566.) The jury was instructed that an adverse inference was permissible only if the defendant was present and knew that a third party had created false evidence and was further instructed that some instructions might not apply. (*Ibid.*) The court "presume[d] the jury understood and followed these instructions," and noted that, "[a]t worst, there was no evidence to support the instruction and it was superfluous." (*Ibid.*) These circumstances were also present here and render any error harmless.

### 1.3.  CALCRIM No. 372

### 1.3.1.  Additional Facts

CALCRIM No. 372 states: "If the defendant fled or tried to flee immediately after the crime was committed or after he was accused of committing the crime, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance

15

of that conduct; however, evidence that the defendant fled or tried to flee cannot prove guilt by itself."

When asked by the court to identify facts that supported providing CALCRIM No. 372 to the jury, the prosecutor explained: "[T]here was considerable evidence that at the time that the birthday cake was brought out that the defendant and Vanessa and [J.C.] were all going to leave at that moment, and they extended their time so that they could sing happy birthday and then the plan was for them to leave, and they never left and never left and never left. [¶] As soon as the stabbing occurred, they were out of there in a heartbeat. He left his shoes there—or a shoe there and fled the scene, and it wasn't like—there was no evidence that they called 911 or contacted the police. They were avoiding the crime scene. And so I think this instruction 372 is highly appropriate." Although defense counsel argued that Figueroa was not aware of the injuries to Jesse until trial, the court concluded that there was sufficient evidence to provide the instruction, and that the instructions would allow the jury to disregard instructions that were inapplicable based on its findings of fact.

### 1.3.2. Analysis

"Evidence showing consciousness of guilt, such as flight or escaping from jail, is generally admissible within the trial court's discretion." (*People v. Anderson* (2018) 5 Cal.5th 372, 391; see also *People v. Lucas* (1995) 12 Cal.4th 415, 471.) "To obtain the instruction, the prosecution need not prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence. [Citation.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 328.)

16

Although testimony supports that Figueroa was planning to leave the party around the time they sang "Happy Birthday," extensive evidence also supports that he was subsequently asked to leave multiple times by multiple people but refused to go. The record further supports that Figueroa departed immediately after Jesse was stabbed. From this evidence, a jury could reasonably infer that he fled the scene to avoid arrest.

"Moreover, even if we were to conclude the instruction should not have been given, any error would have been harmless. The instruction did not assume that flight was established, but instead permitted the jury to make that factual determination and to decide what weight to accord it." (*People v. Carter* (2005) 36 Cal.4th 1114, 1182–1183.) "In the absence of any evidence of flight after accusation, the jury would have understood that the instruction was to that extent inapplicable. The superfluous reference to flight after accusation caused defendant no prejudice." (*People v. Elliott* (2012) 53 Cal.4th 535, 584.)

Once again, CALCRIM No. 200 also mitigates any harm from this instruction being given. In *People v. Pettigrew* (2021) 62 Cal.App.5th 477, at page 502, the court held that instructing the jury with CALCRIM No. 372 based on the defendant's suicide attempts was instructional error, but that this error was harmless because CALCRIM No. 372 and CALCRIM No. 200 instructed the jury "to decide for itself whether defendant's suicide attempts had any relevance when deciding guilt and the degree of murder on count 1 and, if it decided the evidence was irrelevant, it knew to disregard the flight instruction. [Citation.] [¶] By instructing the jury to disregard inapplicable instructions,

17

the trial court mitigated the potential for prejudice from the erroneously given flight instruction."[3]

## 2. The court did not abuse its discretion in denying Figueroa's motion for mistrial.

"A trial court should grant a motion for mistrial 'only when " 'a party's chances of receiving a fair trial have been irreparably damaged' " ' [citation], that is, if it is 'apprised of prejudice that it judges incurable by admonition or instruction' [citation]. 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' [Citation.] Accordingly, we review a trial court's ruling on a motion for

---

[3] We are not persuaded that the prosecutor's reference to the consciousness of guilt instructions during closing argument renders any error in giving them prejudicial. The prosecutor discussed the instructions, but also correctly explained that (1) they only applied if the jury believed that the evidence supported them, (2) they could not prove guilt alone, and (3) the jurors were "the sole judges of the credibility of the witnesses." Figueroa cites *People v. Medellin* (2020) 45 Cal.App.5th 519 for the proposition that "[a] prosecutor's reliance in argument on an improper instruction highlights the prejudicial nature of the error." However, *Medellin* and the other cases on which Figueroa relies involved misstatements of law by the prosecutor, ambiguous or misleading instructions by the court, or improperly admitted evidence. (*See id.* at pp. 532–536; *People v. Maurer* (1995) 32 Cal.App.4th 1121, 1126–1127; *People v. Hendrix* (2013) 214 Cal.App.4th 216, 248–253.) None were cases concerning legally correct but purportedly inapplicable instructions. Because our review of the entire record does not "affirmatively demonstrate[ ] a reasonable probability that the jury in fact found the defendant guilty solely on [an] unsupported theory," affirmance is appropriate. (*People v. Guiton*, *supra*, 4 Cal.4th at p. 1130.)

mistrial for abuse of discretion. [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 573.)

"Although most cases [where a mistrial is requested] involve prosecutorial or juror misconduct as the basis for the motion, a witness's volunteered statement can also provide the basis for a finding of incurable prejudice." (*People v. Harris* (1994) 22 Cal.App.4th 1575, 1581.) "[A] trial court can almost always cure the prejudice of an improperly volunteered statement by granting a motion to strike and charging the jury with an appropriate curative instruction." (*People v. Navarrette* (2010) 181 Cal.App.4th 828, 836.) "A jury is presumed to have followed an admonition to disregard improper evidence particularly where there is an absence of bad faith. [Citations.] It is only in the exceptional case that 'the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions.' [Citation.]" (*People v. Allen* (1978) 77 Cal.App.3d 924, 934–935.)

The erroneous denial of a mistrial motion is prejudicial only if it is reasonably probable that, but for the admission of the material upon which the motion was based, the defendant would have obtained a more favorable outcome. (See *People v. Welch* (1999) 20 Cal.4th 701, 749–750 [*Watson* harmless error standard applies to the denial of motion for a mistrial based on erroneous admission of evidence].)

### 2.1. Additional Facts

Before trial, defense counsel moved to exclude references to Figueroa being a gang member or affiliated with gangs. The prosecutor explained that photos of Figueroa taken at the police station, which the prosecutor intended to use for the purpose of showing the lack of injuries, showed tattoos suggesting a gang

19

affiliation. The court stated: "[G]ang affiliation information can be extremely prejudicial, and so at the very least there should be no reference at all from any of your witnesses about any type of gang affiliations." The court urged the prosecutor to try and find a way to present the photos in a manner that would not include any gang indicia. The court reiterated: "[R]egardless of what photos we allow in, no witnesses should be talking about any type of gangs, assuming that that's not going to come in otherwise in this case." The prosecutor stated that he did not believe this was a case with "gang undertones" and defense counsel agreed. The court therefore ordered that "there will be no discussion of gangs on any level."

While discussing how Figueroa appeared to want to continue to fight after he struck Bryan and Jesse intervened, Shawnta Brown, a witness who attended the birthday party, testified that "[Figueroa] kept running around—I don't recall exactly what gang it was, but it's—." The prosecutor began to ask another question, but the court intervened and instructed the jury: "Ladies and gentlemen, disregard that evidence. All right? You should not consider that for any purpose." Defense counsel then moved for a mistrial at a sidebar conference.

Outside the presence of the jury, the court heard argument on the motion. Defense counsel relied on the court's prior "ruling on witnesses not blurting out anything about gangs."[4] In response, the prosecutor argued that "all [the witness] said was I don't know what gang he is, what gang he's affiliated with"; that her testimony was "extremely brief" and "wasn't specifics"; and

[4] Defense counsel also cited his "prior argument." Any arguments made during the sidebar conference were not reported.

20

"the Court gave an immediate admonishment and we moved on." The prosecutor contended that "the admonishment was satisfactory and the transgression was minimal, at best." The court agreed that the testimony was brief and that it immediately admonished the jury, and noted that it could provide an additional admonishment. However, the court stated: "I'm afraid it was real clear what she said. Didn't specify what gang it was, but clearly that he was a member of a gang."

Notwithstanding his prior agreement that the case did not involve gang undertones, the prosecutor argued that the evidence was relevant because Figueroa had claimed a gang affiliation to intimidate others at the party. The prosecutor asserted that a police report stated that the witness had heard Figueroa yelling "South Side Bakers" and throwing gang signs with his hands. The prosecutor explained that he did not intend to elicit further testimony on this point, but that the small amount of evidence that did come in should not trigger a mistrial.

In response, defense counsel stated: "Thinking back, in regards to my motion for mistrial, we probably aren't there yet, but we could get there if—you know, if it continues, but —and that's the concern." The court asked defense counsel whether, if the motion was denied, he would prefer that the court provide an additional admonition or whether the existing admonition was sufficient. Defense counsel stated that the admonition given was "perfect."

The court concluded: "[M]y thought, then—and it's a very, very close call, by the way—is that I think my curative instruction was very, very timely, and although it's succinct, I did that on purpose because I didn't want to display to the jury shock or awe or anything like that. I think we all just kind of coolly and

calmly went about our business, and my impression is that within a few minutes, allowing the witness to continue to testify, with all the activity and the fights, it was just a little blurb, and what she said almost kind of came and went and the focus was never on that information and we moved on to other information, but I've got to tell you, it was a very, very close call." The court therefore denied the motion, with instructions to the prosecutor to ensure that Brown and other witnesses make no references to gang affiliation.

While instructing the jury on the law before trial began, the court informed the jury that it must disregard any testimony that the court ordered stricken from the record and must not consider that testimony for any purpose. The court repeated this admonition when instructing the jury on the law at the end of trial.

### 2.2. Analysis

The court did not abuse its discretion in denying the motion for mistrial based on a witness's brief allusion to his affiliation with a gang.[5] Even if we assumed it had, the error would not be prejudicial.

---

[5] Although defense counsel ultimately appeared to agree that the witness's gang reference did not require a mistrial, he did not expressly withdraw his motion. Thus, we choose not to address Figueroa's alternative argument that defense counsel was ineffective if he withdrew the motion. Even if the motion was withdrawn and defense counsel had no tactical reason for doing so, we would conclude that there is no reasonable probability the outcome would have been different if not for the error, and thus Figueroa was not prejudiced. (*In re Hardy* (2007) 41 Cal.4th 977, 1018.)

The court immediately ordered the admonished the jury to disregard the evidence and, as the court observed, counsel and the court proceeded "coolly and calmly" and drew no further attention to the comment. The court twice instructed the jury to disregard testimony it had ordered stricken from the record.

Although gang evidence in cases not involving gang enhancements is potentially prejudicial (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049), we presume that the jury followed the court's instructions and disregarded the single, fleeting reference to gang affiliation. (*People v. Boyette* (2002) 29 Cal.4th 381, 436.) "Juries often hear unsolicited and inadmissible comments and in order for trials to proceed without constant mistrial, it is axiomatic the prejudicial effect of these comments may be corrected by judicial admonishment; absent evidence to the contrary the error is deemed cured." (*People v. Martin* (1983) 150 Cal.App.3d 148, 163.) Because Figueroa cites nothing in the record indicating the jurors did not follow the court's admonitions and instructions, we assume that they did and that the error was cured. (See *People v. Abel* (2012) 53 Cal.4th 891, 925 [possible prejudice from brief reference to defendant's past gang affiliation was "dispelled by the court's admonition to disregard that portion of [the] testimony"]; cf. *People v. Burgener* (2003) 29 Cal.4th 833, 875 [brief and isolated reference to uncharged crimes, followed by a clear admonition not to consider it for any reason, "did not irreparably damage defendant's chances of a fair trial"].)

Further, as Figueroa concedes, the cases on which he relies to support his contention that the court abused its discretion bear little similarity to the case before us. In *People v. Tatum* (2016) 4 Cal.App.5th 1125, at page 1128, the trial court told prospective jurors in a murder trial that they would judge witness credibility

23

and should not automatically give someone more or less credit before a witness took the stand. To explain the concept, the trial court related an anecdote: because the court had horrible experiences with plumbers, it would not think a plumber was telling the truth and would not be able to be fair. (*Ibid.*) Thereafter, the defendant's alibi witness testified that the defendant was with him at the time of the murder. (*Id.* at p. 1129.) The alibi witness was a plumber. (*Ibid.*) The appellate court in *Tatum* found that the trial court's comments allowed the jury to discredit a witness without determining credibility in accordance with the proper instructions. (*Id.* at p. 1131.) The comments exceeded the scope of proper judicial comment and interfered with the defendant's constitutional right to a jury trial, requiring reversal. (*Ibid.*) However, a dissenting justice stated that the anecdote was improper but, when viewed in context, did not usurp the jurors' function as judges of witness credibility. (*Id.* at p. 1132 (dis. opn. of Rothschild, P. J.).)

In *People v. Murillo* (2014) 231 Cal.App.4th 448, "[t]he trial court allow[ed] the prosecutor to ask [a prosecution] witness more than 100 leading questions concerning the witness's out-of-court statements to prove defendant guilty of several criminal offenses." (*Id.* at pp. 449–450.) For example, the prosecutor asked the witness: " 'Isn't it true . . . that you were shown six photographs [in January] and asked whether you could identify anybody in those photographs? . . . [D]o you recall telling the detectives that it looks like, but you're not sure, [it is] number four [(Murillo)]? . . . [D]o you recall circling number four [(Murillo)] and putting your initials, the date, and the time on that document? . . . [D]o you recall writing a statement that says, "Number four [(Murillo)] looks like him, but not completely sure.

Kind of the same face structure"? . . . [O]n page one of this exhibit, do you recall signing it under signature of witness in front of the detectives?' " (*Id*. at p. 451.) The witness refused to answer or said he had nothing to say. (*Ibid*.) In concluding that a mistrial should have been granted, the appellate court noted that the witness's "out-of-court statements constituted the only eyewitness identification of Murillo and were a crucial link in the proof" (*id*. at p. 455) and that the prosecutor's "questions create[d] the illusion of testimony" and thus "deprived defendant of a fair trial because he could not exercise his constitutional right of cross-examination." (*Id*. at p. 450.)

The statement at issue in this case was not by the judge discrediting the credibility of a key witness for the defense, nor did the court permit extensive, inappropriate questioning of the only witness to identify the defendant as the culprit. Here, one of the eight prosecution witnesses made a single, brief, and tangential allusion to a gang that the trial court immediately admonished the jury to disregard. It is highly unlikely that the court's actions were unable to cure any potential prejudice to Figueroa. Thus, the court properly exercised its discretion in denying the motion for mistrial.

Even if the court had abused its discretion, which it did not, any error was harmless. As discussed above, there was strong evidence of Figueroa's guilt. It is highly unlikely that he would have realized a more favorable result had the jury not heard the witness's passing reference to a gang. Thus, any error in denying the motion for a mistrial was harmless under the *Watson* standard.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

RICHARDSON, (ANNE K.) J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.