Filed 11/30/23  P. v. Marcos CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MAXIMINO MARCOS,<br><br>    Defendant and Appellant. | D082214<br><br><br>(Super. Ct. No. FWV21004153) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Mary E. Fuller, Judge.  (Retired Judge of San Bernardino Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) Affirmed in part; reversed in part; remanded with directions.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson, Warren J. Williams, and Heather M. Clark, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Maximino Marcos of second degree murder for shooting and killing Victor N. (Pen. Code,[1] § 187, subd. (a); count 1).[2] The jury also found true that Marcos personally and intentionally discharged a firearm, proximately causing great bodily injury and death within the meaning of section 12022.53, subdivision (d).[3]

The court sentenced Marcos to prison for: 15 years-to-life on count 1 plus an additional 25 years-to-life for the firearm enhancement.

Marcos appeals, contending the trial court prejudicially erred by failing to provide jury instructions regarding self-defense and imperfect self-defense. Additionally, Marcos asserts the trial court improperly instructed the jury under CALCRIM No. 362. Finally, Marcos insists that his sentence must be vacated and this matter be remanded for resentencing to allow the trial court to properly exercise its discretion in considering the firearm enhancement.

We conclude that the trial court did not err in instructing the jury. However, we are not certain that the trial court properly exercised its discretion under section 1385 during sentencing. Thus, in an abundance of caution, we vacate Marcos's sentence and remand the matter back to the trial court to resentence Marcos consistent with this opinion. In all other respects, we affirm the judgment.

---

[1]     Statutory references are to the Penal Code unless otherwise specified.

[2]     The jury found Marcos not guilty of first degree murder but convicted him of the lesser included offense of second degree murder.

[3]     At the conclusion of evidence at trial, the prosecution moved to dismiss the allegations that Marcos: (1) personally used a firearm (§ 12022.53, subd. (b)) and (2) personally and intentionally discharged a firearm (§ 12022.53, subd. (c)).

## FACTUAL BACKGROUND

*Prosecution*

Tania M. and Marcos were previously in a long-term relationship. They lived together with Tania's parents and sister, and they have three children. In December 2017, their romantic relationship ended after the birth of their third child. Tania asked Marcos to move out, but he refused because of the children. Tania agreed he could stay. Although they still lived together, they rarely saw each other due to their opposite work schedules.

Tania owned a silver Mustang, which she mostly drove, and a red Ford Explorer (Explorer), which Marcos mostly drove.

Tania and Victor N. met at work. They began a serious dating relationship and had been dating for about five months before Marcus shot Victor. Victor was planning to move in with Tania. She told Marcos she was seeing someone else but did not tell him Victor's name. At some point, Marcos found love letters Victor wrote Tania.

About two months before the shooting, Marcos threatened to kill Tania if she had sex with Victor. Tania did not take this threat seriously.

Marcos saw Tania with Victor about two weeks before the shooting. He walked into a hamburger restaurant where Tania and Victor were eating. When Marcos saw them, he turned around and walked out. Later, Marcos tried to repair his relationship with Tania by, among other means, sending flowers to her place of work. However, Tania told Marcos it was too late to save their romantic relationship. Marcos nevertheless tried to have sex with Tania, but she did not want to engage in any such activity with him. He stopped when he noticed that she was crying.

On March 2, 2019, Tania and Victor went to a motel around 7:00 a.m. The motel has two stories and one entrance that leads to the parking lot. The

3

entrance driveway also serves as the only exit and it is only wide enough for one car. The entrance and parking lot are walled off on three sides by six-foot-tall walls.

Before she left her house, Tania told Marcos she was going to work because she was afraid to tell him she would be with Victor at the motel. Tania and Victor stayed at the motel for about four hours. While they were there, Marcos called Tania's phone, which she said angered Victor.

As they were getting ready to leave the motel, Victor saw Marcos. Tania testified that Victor was angry and told her that Marcos was there. He was parked across the street. Victor stepped outside of the room to get the car, a Ford Mustang. Before leaving, he told Tania he was going to confront Marcos. Victor retrieved the car and drove up next to the room. Tania saw Victor motion to Marcos. Marcos drove into the entrance, and the two cars were stopped facing each other head on. Marcos got out of the Explorer and then Victor went into reverse, driving away to the parking lot.

Hamza A. was staying at the same motel that day. He had just returned from work at around 11:30 a.m. and was sitting inside his car at the far end of the parking lot near a wall. Hamza heard tires screeching and a roaring engine coming into the parking lot. When he turned to look, he saw a Mustang that was attempting to leave the parking lot go into reverse and an Explorer enter the parking lot pursuing it at a high rate of speed.

Victor reversed the Mustang into a parking stall no more than six to 10 feet away from Hamza. A wall was behind the Mustang and Marcos quickly drove the Explorer in front of the Mustang so that it was blocked in. The two men exited their vehicles at essentially the same time. Marcos came out of the Explorer, yelling loudly. Victor took his sweater off. He did not have a weapon in his hands. Marcos was yelling in Spanish and holding something

4

in his hand. Marcos was angry and aggressive and called Victor a "motherfucker" and said, "fuck you." Victor did not say much but swore back at Marcos and then immediately began backing off and putting his arms up. Someone then said, "You need to calm the fuck down." Marcos continued acting aggressively. Victor "was not aggressive in any way or form" and did not put his fists up in an aggressive manner. Hamza did not see the victim throw a punch, kick, or otherwise threaten Marcos.

Suddenly, several gunshots were fired. Victor never had a chance to run. He fell to the ground. Victor did not get up or move after being shot. Hamza saw Marcos holding a black gun in his hands. He made eye contact with Marcos. Hamza was terrified and thought Marcos was going to shoot him.

Tania heard the shots and opened the door to find Marcos standing over Victor, who was on the ground and not moving. She saw something black in Marcos's pants. She was scared; so, she closed the door and ran to the restroom.

Marcos got in his car, reversed it, and then tried to get into Tania's room. Hamza heard a lot of screaming, as if Marcos was trying to break in the motel room. When Tania saw the police arriving, she went outside and Marcos was crying and said he was going to kill himself. Marcos subsequently left the motel parking lot.

Responding officers found Victor laying on the ground on his back with multiple gunshot wounds to the head, arm, and chest. He was pronounced dead at the scene.[4] There were no weapons near him. Officers interviewed

---

[4]   Victor died from multiple gunshot wounds, two of which were to his head. There was evidence that at least two of the shots were at close range.

5

Marcos's brother on the day of the shooting. He told them that a weapon had been discarded in a water channel near the freeway.

On March 2, 2019, officers drove a witness to a wash near a freeway onramp. The witness pointed out where the firearm had been thrown, and officers located the firearm. The firearm was an older model brown and black revolver. It had the capacity to hold six bullets, but it was empty.

Officers searched Tania's Mustang. A black LG cell phone was found hidden in the trunk under the panel for the spare tire. The phone was turned on and had a charge of 72 percent. A text message on the phone indicated that the Live 360 app, which provides GPS location data, was activated on the phone.

Officers searched the entire parking lot but were unable to locate spent casings at the crime scene, which is consistent with a revolver being used. Such guns do not expel casings after being fired.

Using cell phone information, officers were able to locate Marcos. They initiated a traffic stop and arrested him.

Hamza was interviewed by officers at the police station. He was presented with a photographic lineup and asked if he could identify the shooter. Despite recognizing Marcos in the lineup, he did not pick Marcos's photograph at that time because he did not want to be part of the case. Instead, he pointed to another person's photograph and said he was 50 percent sure that the person pictured was the perpetrator.[5]

The police interviewed Marcos after he waived his *Miranda*[6] rights. According to Marcos, three to four weeks before the shooting, he found love

---

[5] The parties stipulated to this fact at trial.

[6] *Miranda v. Arizona* (1966) 384 U.S. 436.

6

letters from Victor to Tania. She told him to ignore them and that they were from "some crazy . . . guy." Marcos admitted to officers that he had been thinking about shooting Victor for three weeks. About two weeks before the shooting, Marcos hid a cell phone he purchased in the trunk of Tania's Mustang. He downloaded a location tracking application to the cell phone before he hid it in her trunk. He put the phone with the tracker in the Mustang because he knew she would meet with Victor eventually. He checked the tracker every day to see if Tania was where she said she would be.

Marcos saw Tania and Victor together at a hamburger restaurant about two weeks before the shooting. He knew where they were because he used the cell phone tracker. He was "exploding" but calmed himself down. Marcos obtained the gun and six bullets from a friend after seeing them together at the restaurant. When he obtained the gun, his plan was to kill Victor and then himself. Marcos told Tania about his intentions. She did not believe him.

In the weeks leading up to the shooting, Marcos called Victor and told him he was going to "fucking sock him." Victor responded that he was not scared and would "whoop" Marcos.

On the morning of March 2, 2019, Marcos tried to call Tania at work, but she did not answer. He then drove to Tania's work to try to find her. When he discovered she was not at work that morning, he checked the location tracker, which showed she was at a motel.

Marcos was "acting . . . crazy" and "wasn't thinking right." He parked at a fast food restaurant across the street from the motel. He saw Tania's Mustang, and he waited for three hours to see whether she was there or if someone else had borrowed the car. He called her again, but she did not

7

answer.  He saw Victor come out of the room and start driving the Mustang. Marcos drove to the motel to confront Victor as he was trying to leave.

Victor put the Mustang in reverse and made a hand sign at Marcos to follow him.  Victor backed into a parking spot in the back parking lot and got out of the car.  Marcos got out of his car and was "thinking crazy."  His head was "rolling with rage," and he wanted to shoot Victor.  Victor started running toward Marcos; so, Marcos took the gun out of his waistband and shot him.  Marcos did not know whether Victor said anything to him.

Marcos shot Victor two or three times, including in the head and in the arm.  Victor fell down after the first shot.  Marcos shot Victor again after he fell to the ground and then kicked him.  Marcos did not see Victor holding a gun or knife.

Marcos did not see Tania until after he shot Victor.  Before he left, he stopped at Tania's room.  The door was open.  He told her, "let's go" and she said "no."  She went back inside the room and closed the door.  He tried to open it, but the door was locked.  Marcos told officers that he would have shot himself if Tania came out of the hotel with Victor.  Marcos said he picked that day because he "was feeling something or that she would lie."

Marcos fled to a park and called Tania.  She told him that he "fucked it up."  When he told Tania he did not want to live anymore, she told him not to kill himself and to think of his kids.  Marcos went for a walk and called his brother.  His brother picked him up, and Marcos told him what happened. Marcos's brother said that Marcos was stupid and should turn himself in. Marcos declined to do so.  Marcos's brother took him to eat and then to see his kids.  Marcos contemplated running to Mexico.

Marcos said that he was not scared of Victor and was not afraid that Victor would beat him up.  Marcos felt bad for what he did to himself and his

kids but not for what he did to Victor. Throughout most of the questioning by officers, Marcos maintained he did not know what happened with the gun because he dropped it in the hotel parking lot. Ultimately, Marcos admitted that he threw the gun in the waterway adjacent to the freeway.

*Defense*

The defense called an officer to impeach Hamza's testimony regarding whether he heard the subjects speaking Spanish and whether someone said, "you mother fucker" and "I don't have it."

DISCUSSION

I

SELF-DEFENSE AND IMPERFECT SELF-DEFENSE INSTRUCTIONS

A. Marcos's Contentions

Marcos argues the trial court prejudicially erred in declining to provide the jury with instructions on self-defense and imperfect self-defense. We disagree.

B. Background

Marcos's counsel requested that the court instruct the jury with CALCRIM Nos. 505 (self-defense) and 571 (imperfect self-defense). Regarding CALCRIM No. 505, the court stated that because Marcos did not testify, the only evidence of his state of mind was his statements to the police that he went to the motel with the intent to kill and that he was not afraid of the victim. Defense counsel countered that the video showed Victor taking his sweatshirt off in a fighting manner after throwing his hands up in the air, challenging Marcos to come forward and that Victor swung at Marcos. Counsel further argued that, in Marcos's statement to police, he said Victor ran at him, and it happened quickly. Further, even though Marcos told officers he had been thinking about killing Victor for two weeks, he also made

9

statements that he did not form the intent to kill until after he found Tania and Victor at the hotel, and the video shows Victor take a swing at him.

The prosecution responded that the evidence did not support self-defense. To this end, the prosecution emphasized that Hamza testified that Victor was not violent, and the video showed Victor backing up and retreating when Marcos pulled in front of the Mustang and blocked him in. Additionally, the prosecution pointed out that the video showed Marcos stepping out of the Explorer already holding the gun when Victor was still next to the Mustang. And the evidence showed that Marcos was the initial aggressor by calling Victor and telling him he was going to "sock him." Marcos thought about killing Victor for three weeks and then waited for three hours at the motel knowing he was going to kill Victor.

Marcos's counsel argued it was a mischaracterization to say that Marcos trapped Victor in the driveway. Victor beckoned him over and challenged him to a fight, which was why he reversed into the parking lot. Victor ripped his sweatshirt off, indicating he wanted to fight. Additionally, Marcos's statement that Victor ran at him and then he shot him was evidence that Marcos acted in self-defense.

The trial court was not persuaded and found the evidence did not support instructing the jury with CALCRIM No. 505 or 571.

However, among other instructions, the jury was instructed with CALCRIM Nos. 522 (Provocation: effect on degree of murder), 570 (Voluntary manslaughter: heat of passion – lesser included offense), and 640 (Deliberations and completion of verdict forms: for use when jury is given not guilty forms for each level of homicide).

C. Legal Principles

"Whether or not to give any particular instruction in any particular case entails the resolution of a mixed question of law and fact that . . . is however predominantly legal. As such, it should be examined without deference." (*People v. Waidla* (2000) 22 Cal.4th 690, 733 (*Waidla*).) Thus, "[w]e review the trial court's decision de novo. In so doing, we must determine whether there was indeed sufficient evidence to support the giving of [an] instruction." (*People v. Cole* (2004) 33 Cal.4th 1158, 1206; see *People v. Simon* (2016) 1 Cal.5th 98, 132–133 (*Simon*) [analyzing court's refusal to give an imperfect self-defense instruction]; cf. *People v. Moon* (2005) 37 Cal.4th 1, 30, 32 ["a trial court may properly refuse an instruction offered by the defendant if it . . . is not supported by substantial evidence"].)

It is well-settled that a trial court has a sua sponte duty to instruct on the basic principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case. (*People v. Brooks* (2017) 3 Cal.5th 1, 73 (*Brooks*).) As a result, "[t]he trial court is charged with instructing upon every theory of the case supported by substantial evidence, including defenses that are not inconsistent with the defendant's theory of the case." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047; see *People v. Thomas* (2023) 14 Cal.5th 327, 385 (*Thomas*) [" '[A] trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case' "].)

"Substantial evidence supporting sua sponte instruction on a particular defense is evidence that is 'sufficient to "deserve consideration by the jury, i.e., 'evidence from which a jury composed of reasonable [persons] could have concluded' " ' that the particular facts underlying the instruction did exist." (*Brooks*, *supra*, 3 Cal.5th at p. 75; *People v. Barton* (1995) 12 Cal.4th 186,

201, fn. 8 ["evidence that a reasonable jury could find persuasive"].) Nevertheless, " '[s]peculative, minimal, or insubstantial evidence is insufficient. . . .' " (*Thomas, supra,* 14 Cal.5th at p. 385.) "Although a trial court should not measure the substantiality of the evidence by undertaking to weigh the credibility of the witnesses, the court need not give the requested instruction where the supporting evidence is minimal and insubstantial." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1145, fn. omitted.) " ' "Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused." ' " (*People v. Steskal* (2021) 11 Cal.5th 332, 345.)

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) As applied to murder, "[t]he doctrine of self-defense embraces two types: perfect and imperfect." (*People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1168.)

"A killing in perfect self-defense is justifiable homicide. [Citation.] Perfect self-defense requires that 'one must actually and reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury.' [Citations.] 'To satisfy the imminence requirement, "[f]ear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of imminent danger to life or great bodily injury." ' [Citation.] ' " '[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*' " ' " (*Thomas, supra,* 14 Cal.5th at pp. 385–386.)

Moreover, "[a] bare fear . . . is not sufficient to justify [a homicide]. But the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such

12

fears alone." (§ 198; see *People v. Nguyen* (2015) 61 Cal.4th 1015, 1045 (*Nguyen*) [discussing "fear alone"]; *People v. Kaihea* (2021) 70 Cal.App.5th 257, 265 ["evidence of motive is relevant to refute a claim of self-defense"].)

Thus, " '[t]he justification of [perfect] self-defense requires a double showing: that defendant was actually in fear of his life or serious bodily injury and that the conduct of the other party was such as to produce that state of mind in a reasonable person.' " (*People v. Watie* (2002) 100 Cal.App.4th 866, 877 (*Watie*).) This constitutes an objective assessment of the defendant's perceived need to defend, and "the ultimate question is whether a reasonable *person* . . . would believe in the need to kill to prevent imminent harm." (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1087.)

"Imperfect self-defense, on the other hand, 'occurs when a defendant acts in the actual but unreasonable belief that he or she is in imminent danger of great bodily injury or death.' [Citation.] Imperfect self-defense reduces an intentional, unlawful killing to voluntary manslaughter, a lesser included offense of murder, by negating a defendant's malice." (*Thomas, supra*, 14 Cal.5th at p. 386.) As a result, "imperfect self-defense is not an affirmative defense, but a description of one type of voluntary manslaughter. Thus the trial court must instruct on this doctrine, whether or not instructions are requested by counsel, whenever there is evidence substantial enough to merit consideration by the jury that under this doctrine the defendant is guilty of voluntary manslaughter." (*People v. Manriquez* (2005) 37 Cal.4th 547, 581; see *Simon, supra*, 1 Cal.5th at p. 132 [imperfect self-defense voluntary manslaughter is a lesser included offense of murder not an affirmative defense].)

Even so, the imperfect self-defense doctrine "is a ' "narrow" ' one and 'will apply only when the defendant has an actual belief in the need for self-

13

defense and only when the defendant fears immediate harm that " ' "*must be instantly dealt with.*' " ' " (*People v. Landry* (2016) 2 Cal.5th 52, 98.)  " 'Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually*, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter.' [Citation.] '[J]ust as with perfect self-defense or any defense, "[a] trial court need give a requested instruction concerning a defense *only if there is substantial evidence to support the defense.*" ' " (*Nguyen, supra*, 61 Cal.4th at pp. 1048–1049.)

"The subjective elements of [perfect] self-defense and imperfect self-defense are identical.  Under each theory, the appellant must actually believe in the need to defend himself against imminent peril to life or great bodily injury.  To require instruction on either theory, there must be evidence from which the jury could find that appellant actually had such a belief." (*People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262.)

Moreover, if there was no substantial evidence of an imminent danger of great bodily injury or death, a trial court does not err by refusing to instruct on either theory of self-defense.  (See *Simon, supra*, 1 Cal.5th at p. 134 [because there was not substantial evidence supporting the defendant's actual belief of imminent danger of death or great bodily injury, the trial court would not have erred had it refused to instruct on either form of self-defense].)

D. Analysis

In the instant action, a jury instruction on either perfect or imperfect self-defense was not warranted because there was no evidence Marcos

14

actually believed, reasonably or unreasonably, that he was in imminent danger of death or great bodily injury. (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 82 (*Oropeza*).) The only eye witness to the shooting (Hamza) testified that Victor was not armed, and even though Victor swore at Marcos, he backed away from him with his hands up before Marcos shot him. Hamza stated that Victor "was not aggressive in any way or form" and did not put his fists up in an aggressive manner. He did not see the victim throw a punch, kick, or otherwise threaten Marcos.

Nonetheless, Marcos focuses on his statements to the police. To this end, he claims that he told the police that he "saw something that he thought was a gun[ ] and was afraid for his life." Yet, his statement does not support his position. Although Marcos told the police that Victor was "running" "towards [him]" when he shot him, his statement that he believed Victor had a gun was less than clear:

> "Det. 2: Anything else about it that sticks out? When, when, uh, when he gets out of the car, uh, what does he say to you?
>
> "M. Marcos: Cussing?
>
> "Det. 2: He's cussing. Um, did he have a knife on him? Did he have a gun? Did he have anything?
>
> "M. Marcos: I thought about it too, he had a gun too.
>
> "Det. 2: You thought he did? Did you see anything?
>
> "M. Marcos: No.
>
> "Det. 2: No. He didn't point a gun at you? He didn't try and stab you? Um, so you weren't trying to protect yourself in any way, it was just . . .
>
> "M. Marcos: I was in rage already.

15

"Det. 2: You were already raged. It didn't matter?

"M. Marcos: Yeah."

Thus, Marcos admitted to the police that he did not see Victor with a gun. Further, he agreed with the police that it "didn't matter" whether Victor had a gun because he was already "in rage." Therefore, we see nothing in Marcos's statement to the police that would support either a self-defense or imperfect self-defense instruction.

Moreover, we are not persuaded by Marcos's reliance on the surveillance video. Marcos points out the video shows Victor rip off his shirt and motion to Marcos in a manner consistent with a challenge to fight.[7] He also asserts the video shows the two men exiting their vehicles, and Victor taking a swing at him. Yet, even if we accept his interpretation of the video as true, it does not support his argument that he reasonably or unreasonably believed he was in imminent danger of grave bodily harm. (See *Oropeza*, *supra*, 151 Cal.App.4th at p. 82.) Indeed, Marcos agreed with the police that he thought he could "probably" "beat [Victor] up" and was not scared of him.

Therefore, we see scant evidence to support a jury instruction for either self-defense or imperfect self-defense. Further, the evidence at trial showed Marcos was the initial aggressor. Neither perfect nor imperfect self-defense apply to a defendant who has created the circumstances under which his adversary's attack is legally justified. (*People v. Enraca* (2012) 53 Cal.4th 735, 761.)

" 'Generally, if one . . . has created appearances justifying the other to launch a deadly counterattack in self-defense, the original assailant cannot slay his adversary in self-defense unless he has first, in good faith, declined

_____

[7] The video does not show Victor taking off his shirt. Rather, he removes his sweater and has a shirt on underneath.

16

further combat, and has fairly notified him that he has abandoned the affray.' " (*Watie, supra*, 100 Cal.App.4th at p. 877.) At each step, Marcos created the circumstances under which Victor's actions were justified. Marcos called Victor and told him he was going to "sock" him. He then showed up and waited outside Victor's motel room with a gun. This was itself a challenge to fight. Marcos thus was the catalyst for any attempt by Victor to confront him. And after Victor retreated to the parking lot, Marcos pursued him and blocked Victor's car with the Explorer. Marcos got out of the Explorer holding the gun before Victor even took his sweatshirt off. By the time Victor saw Marcos, Marcos's arms were outstretched with the gun pointed directly at Victor. Any movement by Victor in Marcos's direction reasonably could be interpreted as a counterattack in self-defense.

Moreover, our analysis does not change if we consider *People v. Vasquez* (2006) 136 Cal.App.4th 1176 or *People v. Randle* (2005) 35 Cal.4th 987 (*Randle*) as Marcos asks us to do. In *Vasquez*, the defendant was convicted of second-degree murder after inviting his cousin into an alley to confront him about raping his younger brother. (*Vasquez*, at p. 1178.) Reacting to the accusation, the victim lunged at the defendant and began choking him. In response, the defendant, who was confined to a wheelchair, pulled out a gun and shot him. (*Ibid*.) The trial court refused to instruct the jury on imperfect self-defense because the court found as a matter of fact that the defendant did not believe he was in imminent peril from the attack and because the defendant created the need to defend himself by luring the victim into the alley. (*Ibid*.) In concluding the trial court erred in failing to instruct on imperfect self-defense, the appellate court first determined that it was for the jury sitting as the trier of fact to decide whether the defendant actually feared serious injury or death from being choked. (*Id*. at p. 1179.) It further

17

found that imperfect self-defense does apply when the victim's use of force is unlawful even if the defendant set in motion the chain of events. (*Id.* at p. 1180.)

In *Randle*, the victim saw the defendant just after breaking into and stealing a stereo speaker from the victim's cousin's car. The victim threatened to beat him up. (*Randle*, *supra*, 35 Cal.4th at p. 991.) The defendant pulled a gun from his pocket and fired it several times, missing the victim. (*Ibid.*) The defendant and his accomplice then fled on foot. (*Ibid.*) The victim and his cousin caught the defendant's accomplice and began to beat him. The accomplice's nose was broken, he was bleeding from the mouth, and he thought he was going to die. (*Id.* at p. 992.) The defendant shouted at the men to stop, but they ignored him and continued to beat the accomplice. (*Ibid.*) At trial, the defendant testified he shot the victim while the victim was beating the accomplice. However, in statements to police, the defendant said he shot the victim after he started running away. (*Id.* at p. 992.) The trial court refused to instruct the jury on imperfect defense of another. (*Id.* at p. 993.) Our high court concluded that the trial court erred in refusing to so instruct because the defendant's conduct did not create circumstances legally justifying the victim's attack on the accomplice. (*Id.* at p. 1003.)

*Vasquez* and *Randle* are distinguishable from the instant matter. In those two cases, the defendants set in motion the chain of events that resulted in the death of one of the participants. But in both cases, there was evidence that each defendant had an actual belief of imminent peril—being choked in *Vasquez* and suffering a severe beating in *Randle*. Here, by contrast, there was no evidence of any such peril to Marcos. Rather, Marcos obtained a gun, tracked Tania to the motel for purposes of confronting Victor,

18

and during the course of that confrontation, shot Victor several times, including once in the back of his head and once in the back of his shoulder. He even kicked Victor while Victor lay dying on the ground. In short, neither *Vasquez* or *Randle* are instructive here.

For the reasons discussed *ante*, we determine that the trial court did not err when it declined to instruct the jury regarding self-defense or imperfect self-defense.

## II

## CALCRIM NO. 362

### A. Marcos's Contentions

Marcos argues the trial court prejudicially erred in instructing the jury on consciousness of guilt under CALCRIM No. 362 because the subject statements were made to protect another person. We are not persuaded.

### B. Background

During the jury instruction conference, the prosecution requested the court instruct the jury under CALCRIM No. 362, based, in part,[8] on Marcos's false statements about discarding his gun at the motel parking lot. Marcos's attorney disagreed, arguing that Marcos made the statements about the gun to protect someone else (his brother) and not for self-protection. Additionally,

---

[8] The prosecution also argued that CALCRIM No. 362 was appropriate based on Marcos's conflicting statements that he was going to turn himself in but was caught in Montclair on the way to a bus station to go to Mexico. The trial court disagreed and told the prosecutor not to argue that Marcos's statements about turning himself in were "false and misleading."

defense counsel contended the statements were unrelated to the charged offense.

The trial court agreed with the prosecution. Therefore, it concluded the statements regarding the gun were related to the crime and determined the instruction was appropriate.

Consequently, the court instructed the jury under CALCRIM No. 362 as follows:

> "If the defendant made a false or misleading statement before this trial relating to the charged crime of knowing the statement was false, or intending to mislead, that conduct may show he was aware of his guilt of the crime, and you may consider it in determining his guilt.

> "If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."

C. Legal Principles

" 'False statements regarding incriminating circumstances constitute evidence which may support an inference of consciousness of guilt. [Citations.]' " (*People v. Flores* (2007) 157 Cal.App.4th 216, 221, quoting *People v. Showers* (1968) 68 Cal.2d 639, 643.) The false nature of the defendant's statement may be shown by inconsistencies in the defendant's own testimony, his or her pretrial statements, or by any other prosecution evidence. (*People v. Kimble* (1988) 44 Cal.3d 480, 498.) Accordingly, "[a] trial court properly gives consciousness of guilt instructions where there is some evidence in the record that, if believed by the jury, would sufficiently support the inference suggested in the instructions." (*People v. Bowman* (2011) 202 Cal.App.4th 353, 366.) Giving the consciousness of guilt instruction is justified when there is evidence the defendant fabricated a story to explain

20

his or her conduct (*People v. Edwards* (1992) 8 Cal.App.4th 1092, 1102) or to deflect suspicion from him or herself (*People v. Rankin* (1992) 9 Cal.App.4th 430, 436 (*Rankin*)).

Whether the jury was properly instructed on the applicable law is reviewed de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218; *People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) The Court of Appeal's task is simply to determine whether the trial court " 'fully and fairly instructed on the applicable law.' [Citation.]" (*Ramos*, at p. 1088.) The instructions as a whole and the entire record of trial, including the arguments of counsel, must be considered. (*People v. Stone* (2008) 160 Cal.App.4th 323, 331; *People v. Dieguez* (2001) 89 Cal.App.4th 266, 276.) It is assumed that the jurors are " ' "intelligent persons and capable of understanding *and correlating* all jury instructions . . . given." ' " (*Ramos*, at p. 1089.) Further, we presume the jury understood and followed the provided instructions. (*Waidla*, *supra*, 22 Cal.4th at p. 725.)

D.  Analysis

On the record before us, we conclude that the trial court did not err by instructing the jury under CALCRIM No. 362. In the instant action, it is undisputed that Marcos used a gun to shoot Victor in the motel's parking lot. Marcos's false statement directly concerned that gun, namely that he dropped the murder weapon in the parking lot after shooting Victor. Only after persistent questioning by the police did he admit that he left the scene of the crime and threw the gun in the waterway near the freeway.

Against this backdrop, we determine that the jury could have viewed Marcos's story of dropping the gun in the motel's parking lot as a fabrication designed to bolster his version of events: He shot Victor in an act of passion rather than as a product of planning and clear judgment. Thus, he dropped

21

the gun and ran because, even after shooting Victor, Marcos remained in a jealous rage. Accordingly, a jury could reasonably infer that Marcos made the subject statement to benefit himself.

Nonetheless, Marcos insists that *Rankin*, *supra*, 9 Cal.App.4th 430 compels a different conclusion. There, the defendant was convicted of being an accessory after the fact to a robbery and of acquiring a credit card that had been taken in the robbery. (*Id*. at p. 432.) When he was questioned by the police, the defendant stated that an individual called "Chilly B." was involved in attempting to use the stolen credit card. (*Id*. at p. 434.) However, the defendant subsequently told a detective that "Chilly B." was not involved and that he had implicated him to protect the individual who actually committed the robbery. (*Ibid*.)

The trial court instructed the jury with the precursor to CALCRIM No. 362 (CALJIC No. 2.03). In concluding the trial court erred, the appellate court determined that "CALJIC No. 2.03 should never be given unless it can be inferred that the defendant made the false statement for the purpose of deflecting suspicion from himself, as opposed to protection someone else. [Citation.] . . . Only under such circumstances does a false statement indicate a consciousness of the defendant's *own* guilt, thus becoming admissible against *him*." (*Rankin*, *supra*, 9 Cal.App.4th at p. 436.)

*Rankin* is not instructive here. In that case, the defendant's statement tended to exculpate a third party and did not deflect suspicion from him. In contrast, Marcos's false statement about what he did with the gun after shooting Victor concerned the placement of the murder weapon immediately after the crime and tended to deflect suspicion that he acted with malice as opposed to in the heat of passion. As such, because it could be reasonably inferred that Marcos fabricated a story about the location of the gun to deflect

22

suspicion from himself, the trial court did not err in giving CALCRIM No. 362.

III

THE FIREARM ENHANCEMENT

A. Marcos's Contentions

Marcos raises two challenges regarding his sentence. First, he argues his 25-year-to-life sentence enhancement under section 1385, subdivision (c)(3)(C) is unauthorized. In the alternative, he contends that this matter must be remanded for resentencing to allow the court to exercise its discretion under *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*) and *People v. Johnson* (2022) 83 Cal.App.5th 1074, review granted Dec. 14, 2022, S277196 (*Johnson*). Although we disagree that Marcos's sentence is unauthorized, we observe, on the record before us, it is unclear whether the court properly exercised its discretion under recent changes to section 1385. Accordingly, remand is necessary to allow the court to properly exercise its discretion. Because we are remanding the matter on the first issue raised by Marcos, we do not reach his alternative challenge to his sentence. That said, during the sentencing hearing, he may raise any issue under *Tirado* or *Johnson* that he believes is applicable.

B. Background

At the sentencing hearing, Marcos's counsel noted that Marcos committed the offense during "an extremely emotionally devastating period of time for" him and "was under an extreme stress." Thus, she requested that the court exercise its discretion and "stay the punishment as to the firearm enhancement."

In response, the prosecutor maintained that the striking of the firearm enhancement under section 12022.53, subdivision (d) was inappropriate. To

this end, he acknowledged that the court was "certainly vested with discretion" but asserted only one of the mitigating factors in section 1385, subdivision (c) even "remotely applie[d]" to Marcos. The prosecutor thus argued:

> "This was a crime that involved a tremendous amount of sophistication. It was planned. It involved a tremendous amount of violence. It involved the use of a firearm. It ended someone's life. It left a daughter without a father, and a sister without a brother, a mother without a son. It is the ultimate crime that we have in our society.
>
> "I don't think any the factors mandate mandatory dismissal. The Court is vested with that discretion.
>
> "In looking at the surrounding circumstances of this case, there is no way that the Court can guarantee that striking the enhancement would promote public safety. This was an incredibly dangerous crime, one that involved a callous amount of violence against the victim and with it, a tremendous amount of suffering."

Defense counsel then noted that the jury had rejected the prosecution's theory that the crime was a "premeditated, . . . planned, and sophisticated act" because it found Marcos not guilty of first degree murder and convicted him of second degree murder. As such, counsel insisted it was in the "interest [of] justice" to "stay th[e] enhancement."

The court declined to strike the firearm enhancement, explaining:

> "All right. While there was clearly evidence of some provocation, there was certainly evidence of planning also in that the defendant told the victim that he would sock him, would hit him, would engage in a fight with him, but then went out and obtained a weapon. So I am going to deny your request to apply my discretion and strike the enhancement.

C. Analysis

Section 1385 has long permitted trial courts to dismiss sentence enhancements, or the additional punishment associated with such enhancements, if doing so is in the furtherance of justice. (See former § 1385, amended by Stats. 1986, ch. 85, § 2, eff. May 6, 1986.) More recently, in 2021, the Legislature passed Senate Bill No. 81 (2021-2022 Reg. Sess.), amending section 1385 to not only grant trial courts the authority, but to also impose a duty upon them to strike or dismiss certain sentence enhancements when it is in the interest of justice to do so, and to specify a set of nine mitigating circumstances that the trial court must consider when making that decision. (Stats. 2021, ch. 721, § 1; *People v. Lipscomb* (2022) 87 Cal.App.5th 9, 16 (*Lipscomb*); *People v. Walker* (2022) 86 Cal.App.5th 386, 395–398, review granted Mar. 22, 2023, S278309 (*Walker*).) As relevant here, section 1385, subdivision (c) now states:

> "(c)(1) Notwithstanding any other law, the court shall dismiss an enhancement ***if it is in the furtherance of justice to do so***, except if dismissal of that enhancement is prohibited by any initiative statute.

> "(2) In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. **Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, *unless the court finds that dismissal of the enhancement would endanger public safety.*** 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others.

> "(A) Application of the enhancement would result in a discriminatory racial impact as described in paragraph (4) of subdivision (a) of Section 745.

25

"(B) Multiple enhancements are alleged in a single case. In this instance, all enhancements beyond a single enhancement shall be dismissed.

"**(C) The application of an enhancement could result in a sentence of over 20 years. In this instance, the enhancement shall be dismissed.**

"(D) The current offense is connected to mental illness.

"(E) The current offense is connected to prior victimization or childhood trauma.

"(F) The current offense is not a violent felony as defined in subdivision (c) of Section 667.5.

"(G) The defendant was a juvenile when they committed the current offense or any prior offenses, including criminal convictions and juvenile adjudications, that trigger the enhancement or enhancements applied in the current case.

"(H) The enhancement is based on a prior conviction that is over five years old.

"(I) Though a firearm was used in the current offense, it was inoperable or unloaded.

"(3) While the court may exercise its discretion at sentencing, this subdivision does not prevent a court from exercising its discretion before, during, or after trial or entry of plea."[9]  (Italics and boldface added.)

Marcos contends the trial court's sentence in this case violates current section 1385, subdivision (c)(2)(B) and (C) because the use of "shall" in those

---

[9]     When Marcos was sentenced, in May 2022, section 1385, subdivision (c)(3) appeared directly after subdivision (c)(2), and before subdivisions (A) through (I).  Effective June 30, 2022, subdivision (c)(3) now appears below subdivision (c)(2)(A)–(I).  (See *Lipscomb*, *supra*, 87 Cal.App.5th at p. 16, fn. 3.)

provisions mandates the dismissal of all but one enhancement and any enhancement that would result in a sentence of over 20 years.

Considering the totality of the statutory language, other courts have rejected similar arguments. (See *People v. Mendoza* (2023) 88 Cal.App.5th 287, 290–293 (*Mendoza*); *People v. Anderson* (2023) 88 Cal.App.5th 233, 238–240, review granted Apr. 19, 2023, S278786 (*Anderson*); *Lipscomb*, *supra*, 87 Cal.App.5th at pp. 15–21; *Walker*, *supra*, 86 Cal.App.5th at pp. 395–398, review granted.)

In *Walker*, the court considered whether section 1385, subdivision (c)(2)(B) mandates the dismissal of all but one sentencing enhancement in all cases. (*Walker*, *supra*, 86 Cal.App.5th at p. 396, review granted.) The appellate court determined that it did not and explained, "the text and purpose of section 1385 in general, and Senate Bill No. 81 in particular, as well as the canons of statutory construction, counsel in favor of concluding that the [relevant statutory language] does not obligate trial courts to automatically dismiss all but one enhancement." (*Walker*, at p. 396.) "The phrase 'all enhancements beyond a single enhancement shall be dismissed' is not a standalone mandate of section 1385. Instead, it appears in the statute appended to one of the nine mitigating circumstances." (*Id.* at p. 397.)

Elsewhere, "[s]ection 1385 explicitly instructs that the existence of a mitigating circumstance—including the one for '[m]ultiple enhancements'— 'weighs greatly in favor of dismiss[al]' " but, under the remaining statutory language, the trial court retains its discretion "to evaluate whether dismissal is in the furtherance of justice by weighing enumerated and unenumerated mitigating factors against whether dismissal of an enhancement would

27

'endanger public safety.' " (*Walker*, *supra*, 86 Cal.App.5th at p. 397, review granted, italics omitted.)

The court therefore concluded that section 1385, subdivision (c)(2)(B) "means what it says—namely, that if a trial court determines that the mitigating circumstance of '[m]ultiple enhancements . . . in a single case' exists and that dismissal of the enhancements will not 'endanger public safety,' then the court's discretion to dismiss is somewhat constrained by the phrase's mandate that the court must dismiss all but one of those multiple enhancements." (*Walker*, *supra*, 86 Cal.App.5th at p. 397, review granted.)

The *Walker* court then went on to address the meaning of section 1385, subdivision (c)(1) and (2), and specifically, the language that the court " '*shall* dismiss an enhancement if it is in the furtherance of justice to do so' " and that the presence of one or more enumerated mitigating circumstance " '*weighs greatly* in favor of dismissing the enhancement . . . *unless* the court finds that dismissal of the enhancement would endanger public safety.' " (*Walker*, *supra*, 86 Cal.App.5th at p. 398, review granted.) In the *Walker* court's view, "[a]lthough a statute's use of the 'shall/unless' dichotomy by itself does not necessarily erect a presumption in favor of whatever 'shall' be done, [citations] section 1385's use of the additional phrase 'great weight' goes a step further than just the 'shall/unless' dichotomy and thereby erects a presumption in favor of the dismissal of the enhancement unless and until the court finds that the dismissal would 'endanger public safety' as that term is defined in section 1385." (*Id*. at pp. 398–399.) But the court declined Walker's request to interpret the provision as requiring courts "to dismiss an

enhancement 'unless there is substantial evidence of countervailing considerations' that justify imposition of the enhancement."[10] (*Id.* at p. 399.)

The court in *Lipscomb* addressed essentially the same issue in the context of section 1385, subdivision (c)(2)(C). There, the trial court had declined to dismiss a section 12022.53, subdivision (d) enhancement—which resulted in imposition of an additional term of 25 years to life—based on a finding that dismissal " 'would result in physical injury or serious danger to others.' " (*Lipscomb*, *supra*, 87 Cal.App.5th at p. 13.) The defendant asserted the dismissal was mandatory based on the "shall be dismissed" language in section 1385, subdivision (c)(2)(C), but, as in *Walker*, the appellate court concluded subdivision (c)(2)(C) did not compel dismissal in all cases. (*Lipscomb*, at p. 21.) Rather, the court explained, the full language of the statute, read in context, "expressly empower[s] the [trial] court to impose the enhancement upon a finding that dismissing it would endanger public safety." (*Id.* at p. 19.) Because the trial court had made such a finding, it was not required to consider the enumerated mitigating circumstances, section 1385, subdivision (c)(2)(C), and therefore did not err by declining to strike the enhancement. (*Lipscomb*, at p. 18.)

Other courts have since relied on the reasoning in *Walker* and *Lipscomb* to reach similar conclusions. (See *Anderson*, *supra*, 88 Cal.App.5th at pp. 238–241, review granted [citing *Walker* and concluding "dismissal [of

---

[10] As noted, the California Supreme Court granted a petition for review in *Walker*. Our high court specified that its review "is limited to the following: Does the amendment to Penal Code section 1385, subdivision (c) that requires trial courts to 'afford great weight' to enumerated mitigating circumstances (Stats. 2021, ch. 721) create a rebuttable presumption in favor of dismissing an enhancement unless the trial court finds dismissal would endanger public safety?" (*People v. Walker*, order granting review issued March 22, 2023, S278309).)

an enhancement under subdivision (c)(2)(B) or (C)] shall occur but only if, in exercising its discretion and giving great weight to certain factors, the court finds dismissal is in the interests of justice or would not endanger public safety"]; *Mendoza, supra,* 88 Cal.App.5th at p. 297 [citing *Walker, Lipscomb,* and *Anderson* as support for the conclusion that dismissal is not required when it would endanger public safety]; cf. *People v. Ortiz* (2023) 87 Cal.App.5th 1087, 1096–1098 (*Ortiz*), review granted Apr. 12, 2023, S278894 [concluding the trial court retains discretion to determine whether dismissal is in the furtherance of justice but declining to follow *Walker* insofar as it suggests the presumption in favor of dismissal can only be rebutted by a showing that dismissal would endanger public safety].)

Although the published opinions addressing this issue have varied to some degree in interpreting the language in section 1385, subdivision (c)(1) and (2), none have concluded that the "shall be dismissed" language in subdivision (c)(2)(B) and (C) requires dismissal where the trial court finds that the dismissal would endanger public safety.[11]  Absent further instruction from our high court, we likewise decline to reach such a decision here.  Rather, we will follow the multitude of published cases concluding that neither subdivision (c)(2)(B) nor (C) requires dismissal of a sentencing enhancement where the trial court concludes dismissal would not be in the furtherance of justice and/or would endanger public safety.  (§ 1385, subd. (c)(2).)

---

[11]    The case that Marcos urges us to follow, *People v. Sek* (2022) 74 Cal.App.5th 657, does not address this issue.  There, the appellate court agreed with the defendant that, on remand, the trial court needed to apply the newly enacted subdivision (c)(2)(C) of section 1385 during resentencing. However, the court did not discuss a situation wherein a court found that dismissal of an enhancement would endanger public safety.

With this background in mind, we turn to the sentencing in the instant matter. As the People acknowledge, the trial court "did not expressly state that [the] dismissal would endanger public safety in rejecting [Marcos's] request to strike the firearm enhancement[.]" However, the People maintain that the court's comments about the evidence offered at trial against Marcos (e.g., he planned the shooting and escalated the violence from a fistfight to a shooting) indicate that the court "found dismissing the enhancement would endanger public safety." We are not persuaded.

Here, we observe that in pointing out that the trial court had the discretion to strike the firearm enhancement, the prosecutor offered an incorrect standard for the court to consider. Instead of explaining that the court could choose not to strike the enhancement if it believed it would endanger the public to do so (see § 1385, subd. (c)(2)), the prosecutor implied that the court should only strike enhancement if the court could "guarantee that striking the enhancement would promote public safety." Thus, the prosecutor's argument did not track the language of section 1385 but rather added a new requirement not found in the statute. And the trial court did not challenge or otherwise question the prosecutor's improper argument.

Moreover, we do not agree with the People that we can simply infer, based on the trial court's comments, that it found that striking the enhancement would endanger public safety. In explaining why it would not strike the enhancement, the court focused on Marcos's planning of the shooting as well as his statement to Victor that he would "sock him, would hit him, would engage in a fight with him, but then went out and obtained a weapon." The court therefore focused entirely on the evidence of the crime committed (giving great weight to evidence that the jury disregarded in acquitting Marcos of first degree murder) and made no comment whatsoever

31

about the danger to public safety that would result if Marcos was sentenced to only 15-years-to-life.

Finally, we are not persuaded by the People's argument that the court properly exercised its discretion in sentencing Marcos because the court's comments were consistent with a finding that it is not "in furtherance of justice" to dismiss the enhancement. (§ 1385, subd. (c)(1).) In other words, the People argue that it does not matter if the court did not make a determination that striking the enhancement would endanger public safety. Rather, according to the People, it is sufficient that the court determined, in the interests of justice, that striking the enhancement was not warranted. However, the court did not state that it was refusing to strike the firearm enhancement in the interests of justice. For this reason alone, we are not persuaded by the People's argument.

Further, although we acknowledge that at least one case, in interpreting section 1385, subdivision (c)(2), disagreed with *Walker* and concluded "the ultimate question before the trial court remains whether it is in the furtherance of justice to dismiss an enhancement" (see *Ortiz, supra*, 87 Cal.App.5th at p. 1098, review granted), we note that case did not address subdivision (c)(2)(C) of section 1385. In contrast, the reported cases that have dealt with the "shall be dismissed" language of subdivision (c)(2)(C) of section 1385 consistently found that a trial court can choose not to strike the enhancement where the sentence will be greater than 20 years if the trial court determines dismissal of the enhancement would endanger public

32

safety.[12]  (See *Walker, supra*, 86 Cal.App.5th at p. 398–399, review granted; *Lipscomb, supra*, 87 Cal.App.5th at pp. 18–21; *Mendoza, supra*, 88 Cal.App.5th at p. 297.)  Although our high court may tell us that the *Ortiz* court has the proper approach, even when section 1385, subdivision (c)(2)(C) is implicated, we decline to go beyond *Walker*, *Lipscomb*, and *Mendoza* on the record before us.

In short, in the instant matter, we cannot determine whether the court refused to strike the firearm enhancement because it determined that doing so would endanger public safety.  Consequently, we believe the prudent course is to remand the matter to the trial court so that it may properly exercise its discretion under section 1385 when resentencing Marcos.  At that time, Marcos may raise any other issue relating to his sentence that he believes appropriate, including but not limited to arguments that can be made under *Tirado, supra*, 12 Cal.5th 688 and *Johnson, supra*, 83 Cal.App.5th 1074, review granted.  That said, we offer no opinion as to what the appropriate sentence for Marcos should be.

---

[12]    The People claim that footnote 6 on page 297 of *Mendoza* supports its position here.  Their reliance on that footnote is misplaced.  (See *Mendoza, supra*, 88 Cal.App.5th at p. 297 ["Because we agree with the trial court's interpretation of section 1385(c)(2) and because the court found that dismissal of the firearm enhancement would endanger public safety, we need not and do not analyze how the 'shall be dismissed' language in section 1385(c)(2)(C) operates when a trial court does not find that dismissal would endanger public safety"].)

DISPOSITION

Marcos's sentence is vacated, and we remand this matter back to the trial court to resentence Marcos consistent with this opinion.  In all other respects, the judgment is affirmed.


HUFFMAN, Acting P. J.

WE CONCUR:


IRION, J.


KELETY, J.